## AKRON, C. & Y. RY. CO. et al. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION, Intervener).

(District Court, S. D. New York. May 25, 1922.)

1. **Carriers ⬤⟷29—Long-standing agreements for division of joint rates presumed fair.**

Agreements between railroads for divisions of joint through rates, in force for more than 30 years, are presumed fair under unchanged conditions.

2. **Carriers ⬤⟷29—Order of Interstate Commerce Commission, changing division of joint through rates, held justified.**

Readjustment by the Interstate Commerce Commission of established divisions of joint freight rates on through traffic between the New England railroads and their connecting roads west of the Hudson *held* justified by changed conditions, brought about by increased rates and large increase in labor and fuel cost, which affected the New England lines comparatively more than their Western connections, because of their comparatively shorter hauls, their less density of freight traffic, their numerous terminals and branch lines, and their greater distance from coal supplies, with the increased cost of its transportation.

3. **Commerce ⬤⟷95—Rate order of Interstate Commerce Commission not set aside by courts, unless violative of Constitution or statute, or not supported by evidence.**

An order of the Interstate Commerce Commission, fixing or prescribing the division of joint rates, based on findings of fact, will not be set aside by the courts unless it is in violation of the Constitution, or does not conform to the statutory authority vested in the Commission, or is not supported by evidence.

4. **Commerce ⬤⟷85—Order fixing division of joint rates between groups of railroads held within powers of Interstate Commerce Commission.**

An order of the Interstate Commerce Commission prescribing division of joint rates between all railroads operating to the west of the Hudson river and connecting New England lines, as groups, without determining the divisions as between individual carriers, *held* within the comprehensive discretionary powers given the Commission by Transportation Act 1920, § 418.

5. **Commerce ⬤⟷88—Order of Commission respecting rates not invalid because provisional.**

The validity of an order of the Interstate Commerce Commission fixing rates or division of joint rates is not affected by the fact that it is provisional and subject to change after further consideration.

In Equity. Suit by the Akron, Canton & Youngstown Railway Company and others against the United States, with the Interstate Commerce Commission intervening. On motion for preliminary injunction. Denied.

Walter C. Noyes and R. W. Barrett, both of New York City, John C. Bills, of Detroit, Mich., George F. Brownell and Clyde Brown, both of New York City, N. S. Brown, of St. Louis, Mo., and A. H. Elder, W. S. Jenney, H. T. Newcomb and Charles C. Paulding, all of New York City, for petitioners.

George F. Brownell and H. A. Taylor, both of New York City, for Erie R. R. System.

---

⬤⟷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Walker D. Hines, of New York City, and J. Carter Fort, of Washington, D. C. (P. J. Farrell, of Washington, D. C., of counsel), for intervening respondent.

Charles F. Choate, Jr., and James Garfield, both of Boston, Mass., for interveners.

Blackburn Esterline, Sp. Asst. Atty. Gen., for the United States.

Before HOUGH, MANTON, and MAYER, Circuit Judges, sitting pursuant to Act Oct. 22, 1913 (38 Stat. 220).

MANTON, Circuit Judge. This is a proceeding under the Urgent Deficiencies Act, approved October 22, 1913 (38 Stat. 219), and the Commerce Court Act, approved June 18, 1910 (36 Stat. 539), by forty-four steam railroad companies operating west of the Hudson river, to annul and enjoin the order of the Interstate Commerce Commission of January 30, 1922, which allowed an increase of fifteen per cent. in divisions accruing to certain carriers operating in the New England states on traffic moving on through joint rates. The United States of America and the Interstate Commerce Commission are made respondents. The New England railroads have been permitted to intervene. The order of January 30, 1922, was entered on complaint of the New England lines asking for an increase of their divisions with the petitioners under the provisions of section 15 of the Interstate Commerce Commission Act, known as the Transportation Act of 1920 (41 Stat. 484, § 418). The original complaint filed with the Commission, dated August 8, 1920, resulted in hearings, and proof was submitted at various dates between December 15, 1920, and April 7, 1921, and on July 6, 1921, the Commission filed a report declining to increase the division of the six complaining railroads operating in New England. A reargument was granted, and on January 30, 1922, the Commission rendered a further report and order granting to the six principal complainants, other than the Bangor & Aroostook Railroad, an increase of their divisions of substantially fifteen per cent.

It appears that, prior to the passage of the Transportation Act of 1920, increases in freight rates were granted to carriers of the country as a whole and are referred to as the 5 per cent. increase, 15 per cent. increase, and the 25 per cent. increase. Upon the passage of the Transportation Act, a proceeding before the Commission, which was known as "Ex parte 74," was instituted under which the Commission, pursuant to the provisions of the Transportation Act, established a rate for the Eastern group of railroads comprising all those railroads between the Canadian border on the north, the Virginia gateway on the south, the Mississippi river on the west and the Atlantic coast line on the east, and these included the New England lines. In such Eastern rate group there was an authorized increase in freight rates to the extent of 40 per cent. and upon the passenger rates of 20 per cent. The New England railroads, making claim to a need for additional revenue because of certain conditions hereinafter referred to, applied for a division which resulted in the order here sought to be modified. Complaint of the New England lines, for increased divisions, was based upon the following claims:

First. That the cost of operation on the New England roads had been relatively very largely increased because of their terminal characteristics; that the New England lines had a very high relative density of branch lines, stations, switchyards, junctions, and a relatively short haul; that the cost of performing service in New England, because of its terminal characteristics and short haul, had relatively increased, while the cost of performing the service of the petitioners, owing to the improvements in heavy loadings, increased motive power, and other factors pertaining to the long haul, had relatively decreased; that the New England lines had a relatively low density of traffic, producing practically only one-third of the number of revenue ton miles per mile of road produced by the lines west of the Hudson river; that the proportion of freight revenue to passenger revenue was much less on the New England lines than on the lines west of the Hudson river, and that the percentage of increased rates granted by the Commission, namely, 40 per cent. on freight and 20 per cent. on passenger traffic, supplied relatively a very much larger amount of revenue to the lines west than it did to the New England lines.

Second. That the standardization of railroad wages brought about during the period of federal control and by the orders of the Labor Board had tremendously increased the cost of labor to the New England lines, and had relatively increased it very much more than it had increased the cost of labor to the lines west of the Hudson river, both because of the fact that the level of wages generally through New England had before the standardization been lower than the level of wages west of the Hudson, and because, owing to the terminal characteristics of the New England lines, a given expenditure of man power produced relatively a smaller amount of revenue ton miles in transportation.

Third. That there had been a much greater relative increase in the cost of fuel needed for the production of power on the New England lines than upon the lines west of the Hudson, due not only to the distance of the New England lines from the coal mines, which prevented them from obtaining their supplies on such favorable terms, but due also to the fact that every increase of freight rates had increased the cost of bringing coal into New England, which increase operated to the benefit of the lines west of the Hudson river and had been paid by the New England lines.

Fourth. The establishment of the so-called per diem system of charging for car hire had, owing to the poorly balanced traffic of the New England lines, which for every five loaded cars received sent out only two loaded cars, imposed a heavy permanent burden on the New England lines since the establishment of the divisions.

[1] Upon the hearings before the Interstate Commerce Commission, evidence was offered to support the claims advanced by the petitioning New England lines. Such testimony is in considerable volume and was given in considerable detail. It established that the joint rates in New England were established in the early 70's and most of the New England roads divisions dated back more than 32 years ago, and in

spite of the changes in the railroad situation, the basis of these divisions has remained practically unchanged. The divisions were based entirely on the trade with mileage, actual or constructive, as the basis. By this long practice of divisions, the parties may be presumed to have considered that it was fair when established. Youngstown Ship & Tube Co. v. P. & L. E. Ry., 29 Interst. Com. Comn. R. 437; Chicago Switching Charges, 28 Interst. Com. Comn. R. 679.

[2] The revenue requirements for the New England roads were proved and considered in considerable detail. The value of the property investment, the fixed charges of the railroads, the resulting deficits and profits during a period of years, were all submitted to the Commission, as were the accounts of the Boston & Maine, the Central Vermont, and the Rutland Railroads. There was evidence of the revenue and property investment per unit of traffic and the net operating income of the New England railroads. There was testimony offered as to the terminal characteristics, the operating handicaps, and the diversity of routes and diffusion of traffic in the New England territory. Such matters as the freight station density, the junction density, and the branch line and the yard density, and the character of the traffic, were all considered in the evidence offered. There was sufficient offered to support an argument of a poorly balanced traffic, and the showing was made that the traffic of the New England roads is spread over a multitude of low-density secondary and branch lines resulting in a relatively short haul. There was also evidence as to the amount of snowfall and the winter conditions which handicapped railroading. The requirements and cost of fuel, together with the wage problem, was considered in considerable detail. We do not deem it necessary to the disposition we shall make of this case to narrate in this opinion the detail of proofs as to each of these various considerations.

A tabulation was submitted showing the alleged claim of the inadequacy of the present divisions as compared with local and New England interline rates and as compared with the cost of service. There were given the percentages which the divisions of the joint rates consisted of, local rates, east and west of the New England junctions, and the relations of the divisions to the mileage prorate east and west. The inadequacy of the present divisions, as indicated by their relation to local rates or mileage prorate, when considered in connection with the length of the haul and character of the service, is thus demonstrated. These tabulations of the several petitioning New England roads were shown. The Commission's report, accompanying its order, said:

"Complainants perform their part of the interchange service under less favorable conditions than their connections west of the Hudson river. They are terminal lines; their hauls are short; their traffic splits at different junction points, and is diffused over many secondary and branch lines; their train loads are necessarily relatively light; the density of their freight traffic is relatively low; and, while their investment per mile of road is low, their investment per revenue ton mile is relatively high. Moreover, no coal mines are located on their rails, and fuel and many other supplies must be brought from considerable distances."

It was determined that these unfavorable conditions had existed long; that there had been a disproportionate increase in the burden upon the New England lines as compared with their connections during the preceding three years, due to the disproportionate increase in the cost of fuel and to the disproportionate effect in the labor cost per ton mile resulting from the heavy increases in wages. It held that the divisions in question had existed for many years without complaint until the extraordinary changes in the preceding three years, and that it was a reasonable assumption that such divisions had, until those changes, produced on the whole results which were fair. It examined the evidence relative to the reasonableness of the divisions prior to the extraordinary changes of the past three years, and held that there was nothing in the evidence tending to overthrow the presumption that, prior to such extraordinary changes, the divisions produced fair results, and were not unduly favorable on the whole to the New England carriers. It held that these extraordinary changes led inevitably to the conclusion that the New England roads were not fairly and equitably dealt with in the division with the Western connections. It held that the financial needs of the New England lines were not ascribable to the low level of the local freight or passenger rates. It pointed out that, when it made the joint increase in rates in Ex parte 74, it appeared that the New England lines required an increase of 47.5 per cent., while the other carriers in the Eastern group required but 28 per cent., whereas in fact the increase substantially authorized an average of about 37 per cent. throughout the Eastern group, and that under such circumstances, it would not have been unfair to provide that one-half of the increase on merchandise interchange traffic moving between New England and the rest of the country should accrue to the New England lines because of their greater needs. It concluded that a fair result could be accomplished by increasing the divisions of the New England carriers to the extent of 15 per cent. (subject to a limitation set forth in the order for the protection of the carriers west of the Hudson, where the New England lines received more than 50 per cent. of the total rate), and therefore found that the divisions in question should be increased accordingly.

Section 418 of the Transportation Act (41 Stat. 484–486) provides for divisions of rates:

"Sec. 418. The first four paragraphs of section 15 of the Interstate Commerce Act are hereby amended to read as follows:

\*          \*          \*          \*          \*          \*          \*          \*

"(6) Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the Commission and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the Commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been

the just, reasonable, and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith. In so prescribing and determining the divisions of joint rates, fares and charges, the Commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstances which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare or charge."

The petitioners attack the order of the Commission on the grounds that the Commission exceeded its authority in fixing primary divisions east and west of the Hudson river gateway, without at the same time fixing the subdivisions to be received by it of the two or more railroads participating in the haul on either side of the gateway, and that the Commission exceeded its authority in the group treatment of divisions; that is, it is claimed that it should not have been given the broad consideration of the conditions east and west of the gateway, but instead a consideration of each route independent of other routes. It is stated that the particular divisions found by the Commission are therefore unjust, unreasonable, inequitable, and unduly preferential, and prejudicial as among the respective parties thereto; also that the order is invalid because it was made in contemplation of further revision of divisions and that the order is invalid because it is based upon an imperfect structure of divisions. The attack is generally made that there was not a bona fide exercise of the Commission's power to fix divisions, but an attempt to transfer money to the New England roads without statutory authority, and that therefore the constitutional rights of the petitioners have been invaded.

[3] The law is well settled that the courts will not set aside an order of the commission in a proceeding such as this, unless it is in violation of the Constitution, or does not conform to the statutory authority of the Commission, or is not supported by evidence. The courts will not review the wisdom or expediency of the Commission's order, and they will not substitute their judgment for that of the Commission, even though it might be said that an opposite finding could be supported by the evidence.

In Seaboard Air Line Ry. Co. v. United States, 254 U. S. 57, 62, 41 Sup. Ct. 24, 25 (65 L. Ed. 129), the Supreme Court said:

"Moreover the determination of questions of fact is by law imposed upon the Commission, a body created by statute for the consideration of this and like matters. The findings of fact by the Commission upon such questions can be disturbed by judicial decree only in cases where their action is arbitrary or transcends the legitimate bounds of their authority"—citing Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 227 U. S. 88, 33 Sup. Ct. 185, 57 L. Ed. 431; Precooling Case [Atchison, T. & S. F. R. Co. v. U. S.], 232 U. S. 199, 34 Sup. Ct. 291, 58 L. Ed. 568; Los Angeles Switching Case 234 U. S. 294, 34 Sup. Ct. 814, 58 L. Ed. 1319; Pennsylvania Co. v. United States, 236 U. S. 351, 35 Sup. Ct. 370, 59 L. Ed. 616.

[4] It is contended that section 15 (6), as amended, in effect prevents the Commission in dealing with divisions of joint rates or through traffic at a dividing line such as the Hudson river, unless at the same time it examines all the various subdivisions of those joint rates at both sides of that line. It is claimed that, because of this action on the part of the Commission, its order is in violation of the statute, and this because it did not examine all the subdivisions accruing out of the divisions west of the Hudson river to the vast number of different links in various routes west of that river. The discretion which is accorded to the Commission to make these examinations and findings is such that the court will not interfere with the results reached by the Commission, unless it is made to appear that the discretion has been abused, or that it amounts to arbitrary action, a conclusion which we cannot reach upon this record.

The practical necessities of the situation have resulted in transcontinental rates and from points in the West to the Eastern seaboard being primarily divided at natural points located between the connecting lines. There is nothing contained in section 15 (6) which prohibits the Commission from dealing with the matter of divisions in a practical way, and nothing which makes it mandatory upon the Commission at the same time to take up an unworkable task in thus dealing with all of the subdivisions about which there may be no complaint whatever. This record has made it plain that the New England group, so called, presents a transportation situation in a district clearly separable from other districts by a variety of controlling conditions. The Commission had the power to deal broadly with the question of primary divisions at the Hudson river on through traffic between New England points and the rest of the country. Section 15 (6) authorizes the Commission to take up and deal with the question of this primary division at the Hudson river and does not compel the Commission at the same time to deal with all subdivisions. It was found in the past to be a reasonable and helpful practice on the part of carriers as well as on the part of the Commission to deal with divisions of through rates from one well-defined district of the country to another on the basis of the primary division at the gateway between the two districts. It is the practical way to deal with the situation in view of the various number of different routes. Pitts. & W. V. R. v. Pitts. & L. E. Ry., 61 Interst. Com. Comn. R. 272; N. J. P. R. & T. Co. v. C. R. R. of N. J., 63 Interst. Com. Comn. R. 80.

We think that section 15 (6) in effect does not require the Commission to make an independent conclusion as to each carrier and as to the division of each joint rate. If it considers together the various carriers and various divisions and reaches a conclusion equally applicable to such carriers and divisions, its order is valid and enforceable under the act. That this procedure and practice was followed before the Transportation Act of 1920, see the Eastern Case, 20 Interst. Com. Comn. R. 275; the Western Case, 20 Interst. Com. Comn. R. 324; Railway Comm. of Texas v. A., T. & S. F. Ry., 20 Interst. Com. Comn. R. 468. Under section 15, Congress directed the Commission to deal with the rate problems in a general way. In Railway

Commission of Wisconsin v. Chicago, Burlington & Quincy Ry. Co., 257 U. S. 563, 42 Sup. Ct. 232, 66 L. Ed. ——, decided February 27, 1922, Chief Justice Taft said:

"The new measure imposed an affirmative duty on the Interstate Commerce Commission to fix rates and to take other important steps to maintain an adequate railway service for the people of the United States. This is expressly declared in section 15a to be one of the purposes of the bill. * * * The mandatory provision of section 15a that the Commission 'shall' initiate rates so that carriers, as a whole (or as a whole in rate groups designated by the Commission) will earn an aggregate income equal as nearly as may be to a fair return upon the aggregate value of railway property is a highly striking illustration of the new spirit."

Undoubtedly the Commission has a wide discretion to determine when the evidence before it is sufficiently typical, and when the surrounding conditions justify a broad and comprehensive treatment in the matter of divisions of rate as well as rate-making. We find nothing in the record before the Commission in this case to justify any claim of an abuse of that discretion, and the record does disclose that sufficient reasons were advanced of a nature compelling to the Commission why it should deal with the subject in a comprehensive manner such as it did deal with it, and there is nothing to indicate that any conclusion substantially different in its broad outlines could have been arrived at by additional detail and study. The record shows that for three years preceding the order there had been a heavy and far-reaching increase in railroad operating expenses throughout the country. On account of this increase, the Commission in Ex parte 74, made an increase in rates throughout the Eastern district amounting in actual practice to about 37 per cent. It was found in this proceeding that this heavy increase in the operating cost had been proportionately greater in New England than in the rest of the Eastern district, and for this proportionate increase the order in question is made.

The question before the Commission was the apportionment of the joint fund in proportion to the services rendered. In the past, the joint railroad service was largely measured by mileage performed by the participating carriers. This was then the way of expressing the relative burden incurred. It became apparent that other things measure the burden besides mileage, and it was this increasing appreciation of these factors that led to the provisions of section 15, subd. 6, indicating that mileage alone was not to be considered. That the Commission has given consideration to these other factors of operation is explained in its report. The public interest is the leading characteristic of the Transportation Act; as said by the Supreme Court in the Wisconsin Case, "a new departure," imposing "an affirmative duty on the Interstate Commerce Commission to fix rates or take other important steps to maintain an adequate railway service for the people of the United States." The act makes it the Commission's duty to find a way, despite the complexity of the subject, to carry out the new mandate of Congress, and makes it clear that the matter must be dealt with in a comprehensive way.

[5] Nor may just complaint be lodged against this order because it is temporary and provisional, and represents a transfer of revenue

pending the Commission's reaching a conclusion on the subject of divisions. The Commission, in the report made, clearly indicates its willingness and desire to correct such injustice as might be found to arise in detail in connection with the comprehensive manner in which the Commission decided it ought to deal with the subject. This procedure was approved by the Supreme Court in the Wisconsin Case.

"The report and findings of the Commission undoubtedly show that the intrastate fares work an undue discrimination against travelers in interstate commerce and against localities (Houston, E. & W. T. R. Co. v. United States, 234 U. S. 342, 34 Sup. Ct. 833, 58 L. Ed. 1341) in typical instances numerous enough to justify a general finding against a large class of fares. In a general order thus supported, possible injustice can be avoided by a saving clause allowing any one to except himself from the order by proper showing. This practice is fully sustained by precedent in what was done as a sequence of the Shreveport Case (Houston, E. & W. T. R. Co. v. United States, supra). See Meredith v. St. Louis-Southwestern R. Co., 34 Interst. Com. Comn. R. 472; Railroad Com'n of Louisiana v. Arkansas Harbor Terminal Railway Co., 41 Interst. Com. Comn. R. 83; Eastern Texas R. Co. v. Railroad Commission (D. C.) P. U. R. 1917F, 554, 242 Fed. 300; Looney v. Eastern Texas R. Co., 247 U. S. 214, 38 Sup. Ct. 460, 62 L. Ed. 1084. In Illinois C. R. Co. v. Public Utilities Commission, 245 U. S. 493, 508, 38 Sup. Ct. 170, 62 L. Ed. 425, 437, P. U. R. 1918C, 1279, this court indicated its approval of such practice, which was adopted by the Commission. Business Men's League v. Atchison, T. & S. F. R. Co., 49 Interst. Com. Comn. R. 713. Any rule which would require specific proof of discrimination as to each fare or rate and its effect would completely block the remedial purpose of the statute."

We are satisfied that a reasonable investigation was made by the Commission finding that the existing divisions accruing to the New England lines were unjust, unreasonable, and inequitable, and it was warranted in making its temporary order. An exhaustive review of the circumstances and situations which will make intelligent progress in the future determination of rates and the division of same is now in progress by the Interstate Commerce Commission under the Transportation Act of 1920. As was said in Interstate Commerce Commission v. Chicago, R. I. & Pac. Ry., 218 U. S. 88, 102, 30 Sup. Ct. 651, 656 (54 L. Ed. 946), it is the only body authorized to make such a review.

"From whatever standpoint the powers of the Interstate Commerce Commission may be viewed, they touch many interests; they may have great consequences. They are expected to be exercised in the coldest neutrality. The Commission was instituted to prevent discrimination between persons and places. It would indeed be an abuse of its powers to exercise them so as to cause either; and the training that is required, the comprehensive knowledge which is possessed, guards or tends to guard against the accidental abuse of its powers, or, if such abuse occur, to correct it. The possession of such advantages is one of its defenses. * * * As we have said, the Commission is the tribunal that is intrusted with the execution of the interstate commerce laws, and has been given very comprehensive powers in the investigation of and determination of the proportion which the rates charged shall bear to the service rendered, and this power exists, whether the system of rates be old or new. * * * In that inquiry many elements may enter upon which the judgment of the Commission shall first pass, and of which the courts should not be called upon in advance to intimate an opinion. The reasons for this we have indicated, and they will be found at length in the cases which we have cited."

We are satisfied that a reasonable investigation has been made, which warranted the granting of the temporary order which is now complained of, and no valid reasons exist why this court should invalidate or modify this order.

The application for an injunction is denied.