## THE NEW ENGLAND DIVISIONS CASE.[2]

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 646. Argued January 9, 10, 1923.—Decided February 19, 1923.

1. Section 418 of the Transportation Act, 1920, authorizes the Interstate Commerce Commission, when establishing divisions of joint rates, to consider not only what is just, reasonable and equitable as between all the carriers participating, but also the financial needs of particular carriers which should be supplied, in the public interest, in order to maintain them in effective operation as part of an adequate transportation system. P. 189.
2. Where joint rates among a group of carriers were increased by the Commission with special reference to the financial necessities of a part of them, a division, subsequently ordered, which gave the needy carriers a relatively greater share, to meet those necessities, but left the share of the others adequate to avoid a confiscatory

---

[2] The docket title of this case is: *Akron, Canton & Youngstown Railway Company* v. *United States, Interstate Commerce Commission, Boston & Maine Railroad, et al.*

result, did not deprive them of their property without due process of law.   P. 195.

3. In fixing divisions of numerous joint rates of numerous carriers, the Commission is not required by either the Transportation Act or the Constitution, to take specific evidence and make separate adjudication as to each division of each rate of each carrier, but may order a general increase of divisions to the carriers in a specified territory, basing this on evidence which the Commission deems typical in character, and ample in quantity, to justify it in respect of each division of rate involved.   P. 196.

4. An order of the Commission for a general increase of divisions to some of many carriers, made after opportunity for a full hearing had been afforded to all, did not exceed the authority conferred by § 418 of the Transportation Act, or deprive the other carriers of revenues without due process, merely because the Commission recognized that the results would not all be accurate and that changes must be made upon future investigation.   P. 199.

5. An order of the Commission fixing divisions of joint rates among a group of carriers by awarding a horizontal 15% increase to those west of a certain river and leaving the others to divide their proportions according to existing or future agreements or through further applications to the Commission, *held* proper and sufficient. P. 201.

6. The order here involved was supported by the evidence before the Commission.   P. 203.

7. The Court cannot consider the weight of evidence before the Commission or the wisdom of its order.   *Id.*

282 Fed. 306, affirmed.

APPEAL from a decree of the District Court refusing an interlocutory injunction in a suit to set aside an order of the Interstate Commerce Commission.

*Mr. Walter C. Noyes,* with whom *Mr. H. T. Newcomb* was on the brief, for appellants.

*Mr. Herbert A. Taylor,* with whom *Mr. George F. Brownell* was on the brief, for Erie R. R. Co. and Chicago & Erie R. R. Co., appellants.

*Mr. Alexander H. Elder* for Central R. R. Co. of New Jersey, appellant.

*Mr. Charles F. Choate, Jr.*, with whom *Mr. James Garfield* was on the brief, for Boston & Maine Railroad et al., interveners.

*Mr. Blackburn Esterline*, Assistant to the Solicitor General, with whom *Mr. Attorney General Daugherty* and *Mr. Solicitor General Beck* were on the brief, for the United States.

*Mr. Walker D. Hines*, with whom *Mr. P. J. Farrell* and *Mr. J. Carter Fort* were on the brief, for the Interstate Commerce Commission.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

Transportation Act, 1920, c. 91, § 418, 41 Stat. 456, 486, amending Interstate Commerce Act, § 15(6), authorizes the Commission, upon complaint or upon its own initiative, to prescribe, after full hearing, the divisions of joint rates among carriers parties to the rate. In determining the divisions, the Commission is directed to give due consideration, among other things, to the importance to the public of the transportation service rendered by the several carriers; to their revenues, taxes, and operating expenses; to the efficiency with which the carriers concerned are operated; to the amount required to pay a fair return on their railway property; to the fact whether a particular carrier is an original, intermediate, or delivering line; and to any other fact which would, ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another of the joint rate.

Invoking this power of the Commission, the railroads of New England [1] instituted, in August, 1920, proceedings to

---

[1] Except the Boston & Albany which is leased to the New York Central, one of the Trunk Lines which was a respondent before the Commission; and branches of two Canadian systems, the Grand Trunk and the Canadian Pacific.

secure for themselves larger divisions from the freight moving between that section and the rest of the United States, the joint rates on which had just been increased pursuant to the order entered in *Ex parte 74, Increased Rates, 1920,* 58 I. C. C. 220. More than 600 carriers of the United States, mostly railroads, were made respondents. The case was submitted on voluminous evidence. On July 6, 1921, a report was filed. The relief sought was not then granted; but no order was entered. Instead, the parties were directed by the report to proceed individually to readjust their divisional arrangements; and the record was held open for submission of the readjustment; *New England Divisions,* 62 I. C. C. 513. This direction was not acted on. Five months later the case was reargued upon the same evidence. On January 30, 1922, the Commission modified its findings and made an order (amended March 28, 1922) which directed, in substance, that the divisions, or shares, of the several New England railroads[2] in the joint through freight rates be increased fifteen per cent., *New England Divisions,* 66 I. C. C. 196. Since it did not increase any rate, it necessarily reduced the aggregate amounts receivable from each rate by carriers operating west of Hudson River. The order was limited to joint class rates and those joint commodity rates which are divided on the same basis as the class rates.[3] It related only to transportation wholly within the United States. It was to continue in force only until further order of the Commission. And it left the door open for correction upon application of any carrier in respect to any rate.

---

[2] Other than the Bangor & Aroostook, which had been a complainant before the Commission; and the Boston & Albany, which had not.

[3] Thus, the order does not include traffic passing through Canada. Nor does it apply to rates on coal (which constitutes about two-fifths of the total interchanged tonnage); nor to those on certain other commodities.

Prior to the effective date of that order, there was in force between each of the New England carriers and substantially each of the railroads operating west of the Hudson, a series of contracts providing for the division of all joint class rates upon the basis of stated percentages.[4] These agreements were in the form of express contracts. Section 208(b) of Transportation Act, 1920, provided that all divisions of joint rates in effect at the time of its passage should continue in force until thereafter changed either by mutual agreement between the interested carriers or by state or federal authorities. The second report enjoined upon all parties the necessity for proceeding, as expeditiously as possible, with a revision of divisions upon a more logical and systematic basis; made specific suggestions as to the character of the study to be pursued; and invited carriers to present to the Commission any cases of inability to agree upon such revision. No further application was, however, made to the Commission.

In March, 1922, this suit was commenced in the federal court for the Southern District of New York to enjoin enforcement of the order and to have it set aside as void. The Akron, Canton & Youngstown Railway and forty-three other carriers[5] joined as plaintiffs, suing on behalf of themselves and others similarly situated. The United States alone was named as defendant. But the Interstate Commerce Commission and ten New England carriers intervened as such, and filed answers. The case was then heard, on application for an interlocutory injunction, by

---

[4] Compare *St. Louis Southwestern Ry. Co.* v. *United States,* 245 U. S. 136, 139, note 2; *Central R. R. Co. of New Jersey* v. *United States,* 257 U. S. 247.

[5] The number of carriers named as respondents in the order entered by the Commission is 617. Only 44 of these originally joined as plaintiffs in this suit. One of these—the Illinois Central—withdrew; 39 intervened later as plaintiffs. Leading trunk lines—New York Central, the Pennsylvania, and the Baltimore & Ohio—by which a large part of all traffic interchanged with the New England railroads was carried, acquiesced in the Commission's order.

three judges under the provisions of Urgent Deficiencies Act, October 22, 1913, c. 32, 38 Stat. 208, 219. The full record of the proceedings before the Commission, including all the evidence, was introduced. The injunction was denied, 282 Fed. 306; and the case is here by direct appeal. Plaintiffs urge six reasons why the order of the Commission should be held void.

*First.* It is contended that the order is void, because its purpose was not to establish divisions just, reasonable and equitable, as between connecting carriers, but, in the public interest, to relieve the financial needs of the New England lines, so as to keep them in effective operation. The argument is that Congress did not authorize the Commission to exercise its power to accomplish that purpose. An order, regular on its face, may, of course, be set aside if made to accomplish a purpose not authorized. Compare *Southern Pacific Co.* v. *Interstate Commerce Commission,* 219 U. S. 433, 443. But the order here assailed is not subject to that infirmity.

Transportation Act, 1920, introduced into the federal legislation a new railroad policy. *Railroad Commission of Wisconsin* v. *Chicago, Burlington & Quincy R. R. Co.,* 257 U. S. 563, 585. Theretofore, the effort of Congress had been directed mainly to the prevention of abuses; particularly, those arising from excessive or discriminatory rates. The 1920 Act sought to ensure, also, adequate transportation service. That such was its purpose, Congress did not leave to inference. The new purpose was expressed in unequivocal language.[6] And to attain it, new

---

[6] Thus: to enable the carriers " properly to meet the transportation needs of the public," § 422, p. 491; to give due consideration to " the transportation needs of the country, . . . and the necessity . . . of enlarging [transportation] facilities," § 422, p. 488; to " best meet the emergency and serve the public interest," § 402, p. 477; to " best promote the service in the interest of the public and the commerce of the people," § 402, pp. 476, 477; " that the public interest will be promoted," § 407, p. 482.

rights, new obligations, new machinery, were created.
The new provisions took a wide range.[7] Prominent
among them are those specially designed to secure a fair
return on capital devoted to the transportation service.[8]
Upon the Commission, new powers were conferred and
new duties were imposed.

The credit of the carriers, as a whole, had been seriously
impaired. To preserve for the nation substantially the
whole transportation system was deemed important. By
many railroads funds were needed, not only for improve-
ment and expansion of facilities, but for adequate main-
tenance. On some, continued operation would be impos-
sible, unless additional revenues were procured. A gen-
eral rate increase alone would not meet the situation.

---

[7] Among them are the establishment of the Railroad Labor and
the Adjustment Boards. Title III, pp. 469–474; See *Pennsylvania
R. R. Co.* v. *United States Railroad Labor Board, ante,* 72; the pro-
visions for raising capital, by new Government loans, § 210, pp. 468–
9, by loans from the Railroad Contingent Fund (the recapture pro-
vision), § 15a (10, 16), pp. 490, 491; those placing the issue of new
securities under the control of the Commission, unaffected by the
laws of the several States, § 439, pp. 494–496; the provision for con-
solidation of railways into a limited number of systems, § 407, pp.
480–482; provisions for securing adequate car service; *Lambert Run
Coal Co.* v. *Baltimore & Ohio R. R. Co.,* 258 U. S. 377; for joint use
of terminals; for routing; for interchange of traffic between railroads,
and between a railroad and water carrier, § 402, pp. 476–478; § 405,
p. 479; §§ 412, 413, p. 483.

[8] Section 422, pp. 488, 489. To this end, also, the Commission was
empowered, among other things, to permit pooling of traffic or earn-
ings, § 407, pp. 480, 481; to authorize abandonment of unprofitable
and unnecessary lines, § 402, p. 477; *Texas* v. *Eastern Texas R. R.
Co.,* 258 U. S. 204; to fix minimum, as well as maximum, rates; and
thus prevent cut-throat competition and the taking away of traffic
from weaker competitors, § 418, p. 485; to prevent the depletion of
interstate revenues by discriminating intrastate rates, *Railroad Com-
mission of Wisconsin* v. *Chicago, Burlington & Quincy R. R. Co.,* 257
U. S. 563; *New York* v. *United States,* 257 U. S. 591; and to deter-
mine the division of joint rates.

There was a limit to what the traffic would bear.   A five .
per cent. increase had been granted in 1914, *Five Per Cent.
Case,* 31 I. C. C. 351; 32 I. C. C. 325; fifteen per cent. in
1917, *Fifteen Per Cent. Case,* 45 I. C. 303; twenty-five per
cent. in 1918, General Order of Director General, No. 28.
Moreover, it was not clear that the people would tolerate
greatly increased rates (although no higher than necessary
to produce the required revenues of weak lines) if thereby
prosperous competitors earned an unreasonably large re-
turn upon the value of their properties.   The existence of
the varying needs of the several lines and of their widely
varying earning power was fully realized.   It was neces-
sary to avoid unduly burdensome rate increases and yet
secure revenues adequate to satisfy the needs of the weak
carriers.    To  accomplish  this  two  new  devices  were
adopted: the group system of rate making and the divi-
sion of joint rates in the public interest.   Through the
former, weak roads were to be helped by recapture from
prosperous competitors of surplus revenues.   Through the
latter, the weak were to be helped by preventing needed
revenue from passing to prosperous connections.   Thus,
by marshalling the revenues, partly through capital ac-
count, it was planned to distribute augmented earnings,  ·
largely in proportion to the carrier's needs.   This, it was
hoped, would enable the whole transportation system to
be maintained, without raising unduly any rate on any
line.   The  provision concerning divisions was, therefore,
an integral part of the machinery for distributing the
funds expected to be raised by the new rate-fixing sections.
It was, indeed, indispensable.

Raising joint rates for the benefit of the weak carriers
might be the only feasible method of obtaining currently
the needed revenues.   Local rates might already be so
high that a further increase would kill the local traffic.
The through joint rates might be so low that they could
be raised without proving burdensome.   On  the  other

hand the revenues of connecting carriers might be ample; so that any increase of their earnings from joint rates would be unjustifiable. Where the through traffic would, under those circumstances, bear an increase of the joint rates, it might be proper to raise them, and give to the weak line the whole of the resulting increase in revenue. That, to some extent, may have been the situation in New England, when, in 1920, the Commission was confronted with the duty, under the new § 15a, of raising rates so as to yield a return of substantially 6·per cent. · on the value of the property used in the transportation service. *Ex parte 74, Increased Rates, 1920,* 58 I. C. C. 220.[9]

The deficiency in income of the New England lines in 1920 was so great that (even before the raise in wages ordered by the Railroad Labor Board) an increase in freight revenues of 47.40 per cent. was estimated to be necessary to secure to them a fair return. On a like estimate, the increased revenues required to give the same return to carriers in Trunk Line Territory was only 29.76 per cent. and to carriers in Central Freight Association Territory 24.31 per cent.[10] To have raised the additional revenues needed by the New England lines wholly by raising the rates within New England—particularly when rates west of the Hudson were raised much less—might have killed New England traffic. Rates there had already been subjected (besides the three general increases mentioned above) to a special increase, applicable only to New England, of about ten per cent. in 1918. *Proposed*

---

[9] There is evidence that the rate per ton per mile received by the New Haven from freight local to its lines was four times as high as the rate per ton per mile, under existing divisions, on freight interchanged by it with carriers west of Hudson River.

[10] What is known as Official Classification Territory comprises the three subdivisions, New England Freight Association Territory, Trunk Line Association Territory and Central Freight Association Territory. See map, *Five Per Cent. Case,* 31 I. C. C. 350.

*Increases in New England,* 49 I. C. C. 421.   A further large increase in rates local to New England would, doubtless, have provoked more serious competition from auto trucks and water carriers.   For hauls are short and the ocean is near.   Instead of erecting New England into a separate rate group, the Commission placed it, with the other two subdivisions of Official Classification Territory, into the Eastern Group; and ordered that freight rates in that group be raised 40 per cent.   At that rate level the revenues of the carriers in Trunk Line and Central Freight Association territories would, it was asserted, exceed by 1.48 per cent. what they would have received if they had been a separate group.   It was estimated that the excess would be about $25,000,000.[11]   Substantially that amount (besides the additional revenue to be raised otherwise) was said to be necessary to meet the needs of the New England lines.

Plaintiffs insist that Transportation Act, 1920, did not, by its amendment of § 15(6) change, or add to, the factors to be considered by the Commission in passing upon divisions; that it had, theretofore, been the Commission's practice to consider all the factors enumerated in § 15(6);[12] that this enumeration merely put into statutory form the interpretation theretofore adopted; that the only new feature was the grant of authority to enter upon the enquiry into divisions on the Commission's initiative; that this authority was conferred in order to

[11] Estimated on the volume of traffic moving in 1919.

[12] Citing *Star Grain and Lumber Co.* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 14 I. C. C. 364, 370; *Manufacturers Ry. Co.* v. *St. Louis, Iron Mountain & Southern Ry. Co.,* 21 I. C. C. 304, 313; *Investigation of Alleged Unreasonable Rates on Meats,* 23 I. C. C. 656, 661; *Class Rates from Chestnut Ridge Railway Stations,* 41 I. C. C. 62; *Western Pacific R. R. Co.* v. *Southern Pacific Co.,* 55 I. C. C. 71, 84. See *Low Moor Iron Co.* v. *Chesapeake & Ohio Ry. Co.,* 42 I. C. C. 221.

protect the short lines, which, because of their weakness, might refrain from making complaint, for fear of giving offence; [13] and that the power conferred upon the Commission is coextensive only with the duty imposed on the carriers by § 400 of Transportation Act, 1920, which declares that they shall establish "in case of joint rates . . . just, reasonable, and equitable divisions thereof as between the carriers subject to this Act participating therein which shall not unduly prefer or prejudice any of such participating carriers." It is true that § 12 of the Act of June 18, 1910, c. 309, 36 Stat. 539, 551, 552, which first conferred upon the Commission authority to establish or adjust divisions, [14] did not, in terms, confer upon the Commission power to act on its own initiative. The language of the act seemed to indicate that the authority was to be exercised only when the parties failed to agree among themselves, and only in supplement to some order fixing the rates. [15] The extent of the Commission's power was a subject of doubt; and Transportation Act, 1920, undertook by § 15(6) to remove doubts which had arisen. But Congress had, also, the broader purpose explained above. This is indicated, among other things, by expressions used in dealing with joint rates. By new § 15(6), p. 486, the Commission is directed to give due consideration, in determining divisions, to "the importance to the public of the transportation services of

[13] Citing H. R. No. 456, pp. 9, 10, 66th Cong., 1st sess.; Conference Report No. 650, 66th Cong., 2d sess.; Mr. Esch, 59 Cong. Rec., part 4, p. 3268; Senator Robinson, 59 Cong. Rec., part 4, p. 3331.

[14] Power to establish through routes and joint rates had been conferred by § 4 of the Hepburn Act, June 29, 1906, c. 3591, 34 Stat. 584, 590.

[15] Compare *Morgantown & Kingwood Divisions*, 49 I. C. C. 540. The section was involved in *Tap Line Cases*, 234 U. S. 1, 28; *O'Keefe* v. *United States*, 240 U. S. 294, 300; *Manufacturers Ry. Co.* v. *United States*, 246 U. S. 457, 480, 483; *Louisiana & Pine Bluff Ry. Co.* v. *United States*, 257 U. S. 114, 118.

such carriers;" [16] just as by new § 15(3), page 485, the Commission is authorized upon its own initiative when "desirable in the public interest" to establish joint rates and "the divisions of such rates".

*Second.* It is contended that if the act be construed as authorizing such apportionment of a joint rate on the basis of the greater needs of particular carriers, it is unconstitutional. There is no claim that the apportionment results in confiscatory rates, nor is there in this record any basis for such a contention. The argument is that the division of a joint rate is essentially a partition of property; that the rate must be divided on the basis of the services rendered by the several carriers; that there is no difference between taking part of one's just share of a joint rate and taking from a carrier part of the cash in its treasury; and, thus, that apportionment according to needs is a taking of property without due process. But the argument begs the question. What is its just share?—It is the amount properly apportioned out of the joint rate. That amount is to be determined, not by an agreement of the parties or by mileage. It is to be fixed by the Commission; fixed at what that board finds to be just, reasonable and equitable. Cost of the service is one of the elements in rate making. It may be just to give the prosperous carrier a smaller proportion of the increased rate than of the original rate. Whether the rate is reasonable may depend largely upon the disposition which is to be made of the revenues derived therefrom.

---

[16] In thus making clear that in fixing divisions as well as rates the public interest should be considered, Congress doubtless had in mind expression to the contrary in opinions of the Commission. See *Germain Co.* v. *New Orleans & Northeastern R. R. Co.,* 17 I. C. C. 22, 24; *Board of Trade of Chicago* v. *Atlantic City R. R. Co.,* 20 I. C. C. 504, 508; *In re Divisions of Joint Rates on Coal,* 22 I. C. C. 51, 53; *Morgantown & Kingwood Divisions,* 49 I. C. C. 540, 550.

What the Commission did was to raise the additional revenues needed by the New England lines, in part, directly, through increase of all rates 40 per cent. and, in part, indirectly, through increasing their divisions on joint rates. In other words, the additional revenues needed were raised partly by a direct, partly by an indirect tax. It is not true, as argued, that the order compels the strong railroads to support the weak. No part of the revenues needed by the New England lines is paid by the western carriers. All is paid by the community pursuant to the single rate increase ordered in *Ex parte 74.* If, by a single order, the Commission had raised joint rates throughout the Eastern Group 40 per cent., and, in the same order, had declared that 90 per cent. of the whole increase in the joint rates should go to the New England lines (in addition to what they would receive under existing divisions), clearly nothing would have been taken from the Trunk Line and Central Freight Association carriers, in so ordering. The order entered in *Ex parte 74* was at all times subject to change. The special needs of the New England lines were at all times before the Commission. That these needs were met by two orders instead of one, is not of legal significance. The order here in question may properly be deemed a supplement to, or modification of, that entered in *Ex parte 74.*

*Third.* It is asserted that the order is necessarily based upon the theory that, under § 15(6), the Commission has authority to fix divisions as between groups of carriers without considering the carriers individually; that Congress did not confer such authority; and that, hence, the order is void. Whether Congress did confer that authority we have no occasion to consider; for it is clear that the Commission did not base its order upon any such theory. The order directs a 15 per cent. increase in the divisions to the several New England lines. It is comprehensive. But it is based upon evidence which the

Commission assumed was typical in character, and ample in quantity, to justify the finding made in respect to each division of each rate of every carrier.   Whether the assumption was well founded will be discussed later.   Here we are to consider merely, whether Congress authorized the method of proof and of adjudication pursued, and whether it could authorize it, consistently with the Constitution.

Obviously, Congress intended that a method should be pursued by which the task, which it imposed upon the Commission, could be performed.   The number of carriers which might be affected by an order of the Commission, if the power granted were to be exercised fully, might far exceed six hundred; the number of rates involved, many millions.   The weak roads were many.   The need to be met was urgent.   To require specific evidence, and separate adjudication, in respect to each division of each rate of each carrier, would be tantamount to denying the possibility of granting relief.   We must assume that Congress knew this; and that it knew also that the Commission had been confronted with similar situations in the past and how it had dealt with them.

For many years before the enactment of Transportation Act, 1920, it had been necessary, from time to time, to adjudicate comprehensively upon substantially all rates in a large territory.   When such rate changes were applied for, the Commission made them by a single order; and, in large part, on evidence deemed typical of the whole rate structure.[17]   This remained a common practice after the burden of proof to show that a proposed increase of any rate was reasonable had been declared, by Act of June 18, 1910, c. 309, § 12, 36 Stat. 539, 551, 552, to be upon

---

[17] Compare *Burnham, Hanna, Munger Co.* v. *Chicago, Rock Island & Pacific Ry. Co.*, 14 I. C. C. 299; *City of Spokane* v. *Northern Pacific Ry. Co.*, 15 I. C. C. 376.

the carrier.[18]  Thus, the practice did not have its origin
in the group system of rate-making provided for in 1920
by the new § 15a.  It was the actual necessities of proce-
dure and administration which had led to the adoption
of that method, in passing upon the reasonableness of
proposed rate increases.  The necessity of adopting a
similar course when multitudes of divisions were to be
passed upon was obvious.  The method was equally ap-
propriate in such enquiries; [19] and we must assume that

---

[18] *Advances in Rates—Eastern Case*, 20 I. C. C. 243, 248; *Railroad
Commission of Texas* v. *Atchison, Topeka & Santa Fe Ry. Co.*, 20
I. C. C. 463, 484; *Five Per Cent. Case*, 31 I. C. C. 351, 402, 403,
448, 449; *1915 Western Rate Advance Case*, 35 I. C. C. 497; *Western
Passenger Fares*, 37 I. C. C. 1; *Fifteen Per Cent. Case*, 45 I. C. C.
303.  See also the successive orders issued in the Shreveport con-
troversy, 23 I. C. C. 31; 34 I. C. C. 472; 41 I. C. C. 83; 43 I. C. C.
45; 48 I. C. C. 312.  Compare *Houston East & West Texas Ry. Co.*
v. *United States*, 234 U. S. 342, 349; *Eastern Texas R. R. Co.* v. *Rail-
road Commission of Texas*, 242 Fed. 300; *Looney* v. *Eastern Texas
R. R. Co.*, 247 U. S. 214; also *Illinois Central R. R. Co.* v. *State Public
Utilities Commission*, 245 U. S. 493, with *Business Men's League of
St. Louis* v. *Atchison, Topeka & Santa Fe Ry. Co.*, 41 I. C. C. 13,
503, and 49 I. C. C. 713.  The Commission has, since 1920, also
reduced rates in broad group proceedings upon consideration of
typical conditions throughout the entire region involved in the re-
duction.  *Reduced Rates, 1922*, 68 I. C. C. 676; *Rates on Grain, etc.*,
64 I. C. C. 85.  Referring to the latter case the Commission said in
their second report in this case (66 I. C. C. 203), " In all such general
rate cases we have realized and have held that if we were required
to consider the justness and reasonableness of each individual rate,
the law would in effect be nullified and the Commission reduced to a
state of administrative paralysis."

[19] Plaintiffs argue that there is a difference, because all interstate
rates are required to be filed with the Commission and published,
and hence appear specifically in the record; whereas divisions are not
required to be filed or published.  The difference is without legal
significance.  Papers on the Commission files are not a part of the
record in a case,—unless they are introduced as evidence.  It is the
nature of the enquiry, not the accident whether papers are on file
or published, which determines whether facts can be proved by evi-

Congress intended to confer upon the Commission power to pursue it.[20]

That there is no constitutional obstacle to the adoption of the method pursued is clear. Congress may, consistently with the due process clause, create rebuttable presumptions, *Mobile, Jackson & Kansas City R. R. Co.* v. *Turnipseed*, 219 U. S. 35; *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61; and shift the burden of proof, *Minneapolis & St. Louis R. R. Co.* v. *Railroad & Warehouse Commission*, 193 U. S. 53. It might, therefore, have declared in terms, that if the Commission finds that evidence introduced is typical of traffic and operating conditions, and of the joint rates and divisions, of the carriers of a group, it may be accepted as *prima facie* evidence bearing upon the proper divisions of each joint rate of every carrier in that group. Congress did so provide, in effect, when it imposed upon the Commission the duty of determining the divisions. For only in that way could the task be performed. As pointed out in *Railroad Commission of Wisconsin* v. *Chicago, Burlington & Quincy R. R. Co.*, 257 U. S. 563, 579, serious injustice to any carrier could be avoided, by availing of the saving clause which allows · anyone to except itself from the order, in whole or in part, on proper showing.

*Fourth.* It is asserted that the order directs a transfer of revenues of the western carriers to the New England

dence which is typical. The Commission could, of course, require carriers to introduce all their division sheets. To a proceeding of this character the rule acted on in *Florida East Coast Ry. Co.* v. *United States*, 234 U. S. 167, is not applicable; compare *United States* v. *L. & N. R. R. Co.*, 235 U. S. 314.

[20] Since Transportation Act, 1920, the Commission has on several occasions modified the divisions of a carrier without considering each individual joint rate. *Pittsburgh & West Virginia Ry. Co.* v. *Pittsburgh & Lake Erie R. R. Co.*, 61 I. C. C. 272; *East Jersey R. R. & Terminal Co.* v. *Central R. R. Co. of New Jersey*, 63 I. C. C. 80; *Division of Joint Rates and Fares of Missouri & North Arkansas R. R. Co.*, 68 I. C. C. 47.

carriers, pending a decision in the matter of divisions; that Congress has. not granted authority to take such provisional action; and that, hence, the order is void. The argument is, that under § 15(6), the Commission . may prescribe divisions only when, upon full hearing, it is of opinion that those existing are, or will be, unjust, unreasonable or inequitable; that in such event it shall prescribe divisions which are just, reasonable and equitable; and that the provisional character of the order demonstrates that the hearing has not been a full one. Whether a hearing was full, must be determined by the character of the hearing, not by that of the order entered thereon. A full hearing is one in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety, from the standpoint of justice and law, of the step asked to be taken. The Commission recognized, and observed, these essentials of a full hearing.

The complaint before it was filed in August, 1920. The hearings did not begin until December 15, 1920. The parties had, therefore, ample time to prepare to present their evidence and arguments. The case was not submitted until April 23, 1921. There was thus ample time for, and every carrier was, in fact, afforded the opportunity of, introducing any and all evidence it desired. The record made is voluminous. That the evidence left in the minds of the Commission many doubts, is true. But it had brought conviction that the New England lines were entitled to relief; that the divisional arrangements of the carriers required a thorough revision to put them upon a more logical and systematic basis; that a horizontal increase of the New England lines' divisions, made before such revision, would leave some divisions too high and others too low; that the comprehensive revision proposed would necessarily take a long time; and that, meanwhile, the New England lines should be accorded " a

portion of the relief to which  .  .  .  they are entitled and which the public interest clearly requires ".  The Commission further concluded that, on the evidence before it, no substantial injustice would be done to the carriers west of the Hudson by an order which increased by 15 per cent. the existing divisions of the New England lines, and reduced, by the amount required for this purpose, the divisions of the several carriers west of the Hudson, in the proportions in which they then shared the balance of each joint rate; or as otherwise might be agreed between them or determined by the Commission upon application.

A hearing may be a full one, although the evidence introduced does not enable the tribunal to dispose of the issues completely or permanently; and although the tribunal is convinced, when entering the order thereon, that, upon further investigation, some changes in it will have to be made.  To grant under such circumstances immediate relief, subject to later readjustments, was no more a transfer of revenues pending a decision, than was the like action, in cases involving general increases in rates, a transfer of revenues from the pockets of the shippers to the treasury of the carriers.  That the order is not obnoxious to the due process clause, because provisional, is clear.  If this were not so, most temporary injunctions would violate the Constitution.

*Fifth.*  It is contended that the order is void, because it confines itself to dealing with the main, or primary, divisions of the joint rates at the Hudson River and fails to prescribe the subdivisions of that part of the rate which goes to the several carriers.  The argument is, that if the Commission acts at all in apportioning the joint rate, its action is invalid unless it prescribes the proportion to be received by each of the connecting carriers.  For this contention there is no warrant either in the language of the act, in the practice of carriers, or in reason.  The duty imposed upon the Commission does not extend beyond

the need for its action. If the real controversy is merely how much of the joint rate shall go to carriers east of Hudson River and how much to carriers west, there is nothing in the law which prevents the Commission from letting the parties east of the river, and likewise those west of it, apportion their respective shares among themselves. It is obviously of no interest to the western carriers how those of New England decide to apportion their share; nor is it of interest to the eastern carriers how those west of the Hudson divide the share apportioned to that territory. If on these matters the carriers interested can reach an agreement and no public interest is prejudiced, clearly, there is no occasion for the Commission to act.

But there is a further answer to this contention. The Commission has fixed the subdivisions east and also those west of the River. The divisions of the several New England lines are definitely fixed; for the amount receivable by each carrier from each joint rate is ordered increased fifteen per cent. What remains of each joint rate goes to the western lines. This balance, the order recites, shall be divided among them " in the same proportions as at present, or otherwise as they may agree, or failing such agreement, as may be determined by the Commission upon application therefor." That fixes the divisions by reference. The fact that they are fixed provisionally and by reference, does not invalidate the order. It is urged that this disposition demonstrates failure by the Commission to consider the several factors which the statute declares shall be taken into consideration in determining divisions. But this is not true. This feature in the order indicates rather that the Commission has considered the question; concluded that the apportionment by the western lines of their share on existing proportions, was not inconsistent with the public interest; and that, in the absence of complaint, it might be assumed to be satisfactory to all parties. This objection presents in a different form largely

what has been more fully discussed above.   There was,
thus, on the part of the Commission neither usurpation of
power, nor neglect of duty, in limiting its definite deci-
sion to the primary divisions at the Hudson River gate-
ways, and leaving the interested parties to deal, in the
first instance, with the subdivisions among the carriers
in their respective territories.[21]

   *Sixth.*   It is contended that the order is void, because
it is unsupported by evidence.   An order of the Commis-
sion fixing rates, if unsupported by evidence, is clearly in-
valid, *Interstate Commerce Commission* v. *Union Pacific
R. R. Co.,* 222 U. S. 541, 547; *Florida East Coast Ry. Co.*
v. *United States,* 234 U. S. 167.   The rule must, of course,
be the same in respect to an order fixing divisions.   The
contention that the order is unsupported by the evidence
rests largely upon arguments which assume a construction
of the statute which we hold to be erroneous, or upon ex-
pressions in the first report of the Commission, which, in
view of the second report and order. thereon, must be
deemed to have been withdrawn.   That the evidence was

   [21] The junction points on which are based the divisions between
the New England lines and the lines operating west of the Hudson
River were fully set forth in the report of the Commission.   To fix
divisions on the percentage basis with a basic dividing line--was what
had been commonly done in the agreements of carriers through their
freight associations.   In leaving to the respondent carriers, in the first
instance, the apportionment among themselves of that part of the
joint rate receivable by the carriers operating west of the Hudson
River the Commission followed a long established practice.   *Browns-
ville, Texas, Class and Commodity Rates,* 30 I. C. C. 479, 484; *Pa-
cific Fruit Exchange* v. *Southern Pacific Co.,* 31 I. C. C. 159, 161, 162,
163; *Grain Rates from Milwaukee,* 33 I. C. C. 417, 420, 421; *Sloss-
Sheffield Steel & Iron Co.* v. *Louisville & Nashville R. R. Co.,* 35 I.
C. C. 460, 465, 466; *St. Louis, Missouri—Illinois Passenger Fares,* 41
I. C. C. 584, 598, 599.   And the practice had at least the tacit ap-
proval of this Court.   Compare *Intermountain Rate Cases,* 234 U. S.
476, 485, 486, 494; *O'Keefe* v. *United States,* 240 U. S. 294; *Manu-
facturers Ry. Co.* v. *United States,* 246 U. S. 457.

ample to support the order made, is shown in the opinion
of the lower court, 282 Fed. 306, 308, 309, and in the re-
ports of the Commission. To consider the weight of the
evidence, or the wisdom of the order entered, is beyond
our province. *Manufacturers Ry. Co.* v. *United States,*
246 U. S. 457; *Skinner & Eddy Corporation* v. *United
States,* 249 U. S. 557, 562; *Seaboard Air Line Ry. Co.* v.
*United States,* 254 U. S. 57, 62. But the way is still open
to any carrier to apply to the Commission for modifica-
tion of the order, if it is believed to operate unjustly in
any respect.

*Affirmed.*