### ABILENE & S. RY. CO. et al. v. UNITED STATES et al.

(District Court, D. Kansas, Second Division. March 16, 1923.)

No. 278–N.

1. Carriers ⟨⟩29—Necessities of carrier not basis for division of joint rates.

The necessities of a carrier and the fact that it is being operated at a deficit are not a sufficient ground on which to order an increase in the division of joint rates in favor of the failing carrier.

2. Carriers ⟨⟩29—Participants in joint service are entitled to compensation in proportion to amount and cost of service.

Participating carriers in a joint service are entitled to be compensated in proportion to the amount of service and the cost of the services which each render, and the fact that one of them is prosperous and the other not does not affect the just right of each to a fairly proportionate share out of the joint earnings, regardless of whether the amount distributed to each be fully compensatory, or be less to each than the value of the services so rendered.

3. Carriers ⟨⟩29—Commission cannot order new division of joint rates, unless those fixed are shown to be unjust.

Under Interstate Commerce Act, § 1, par. 4 (Comp. St. § 8563), it is the duty of participating carriers to establish by agreement a just division between them of the joint rates, and the law presumes that this obligation has been complied with and that the division by the carriers is just, and the Interstate Commerce Commission is without power under section 15 (6) of the act, as amended by Transportation Act Feb. 28, 1920, to prescribe new divisions, unless, after full hearing, it is of the opinion on the facts adduced that the existing divisions are unjust, and unless in the record presented there is some evidence to sustain such conclusion, its order establishing new divisions is nonenforceable.

4. Carrier ⟨⟩29—Exhibits held not to show division of joint rates was unjust.

Exhibits for the Interstate Commerce Commission at a hearing on the division of joint rates, which showed that the complaining carrier re-

⟨⟩For other cases see same topic & KEY-NUMBER in 'all 'Key-Numbered Digests & Indexes

ceived, under the existing division, more per ton mile than the other carriers, without showing any extra service rendered by that carrier, or any ground for complaint, except that its revenues were insufficient to meet its operating expenses, did not alone show that the divisions of joint rates were unjust, so as to sustain an order of the Commission prescribing new divisions.

5. Commerce ⬤⟿86—Annual reports of carriers held not in evidence before Commission.

The rule of the Interstate Commerce Commission regulating the offer in evidence of reports and tariffs, part of which only is relevant, does not make the annual reports of carriers filed with the Commission evidence to be considered by the Commission at a hearing on the division of joint rates, where no attempt was made to bring the relevant parts of such reports before the Commission in the manner prescribed by the rule.

6. Carriers ⬤⟿29—Reports of carriers to Commission held not to show division of joint rates was unjust.

Annual reports by connecting carriers to the Interstate Commerce Commission, which showed that the connecting carriers all made a profit in their operation, while the carrier which objected to the division of the rates was operated at a loss, but which were based on total revenue, both freight and passenger, and joint and local, and showed that the objecting carrier received more per ton mile than any of the connecting carriers, and more per car mile and per train mile than some of the connecting carriers, *held* not to show that the divisions were unjust.

7. Carriers ⬤⟿29—Transportation Act does not authorize imposing on strong roads burden of relieving weaker ones.

Transportation Act Feb. 28, 1920, discloses no intention to vest the Interstate Commerce Commission with power to relieve the necessities of weaker lines by imposing the burden on the connecting lines, simply because they are able to bear it, and exhibits a contrary purpose in section 422, adding section 15a to the Interstate Commerce Act, requiring a portion of excess earnings to be paid into a fund to be loaned to weaker roads.

8. Carriers ⬤⟿29—Not all elements mentioned in statute are to be considered in determining division of joint rates.

The provision of Interstate Commerce Act, § 15 (6), as amended by Act Feb. 28, 1920, that, in prescribing and determining the divisions of joint rates, fares, and charges, the Interstate Commerce Commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenues required, etc., must be construed as not limited to the paragraph relating to authority to prescribe divisions of joint rates, but to the entire section, so that some of the elements therein mentioned, which are immaterial on the division of the rates, are not to be considered on that issue, but on issues arising under other paragraphs.

9. Commerce ⬤⟿89—Order of Commission is final, without application for rehearing.

Since the application to the Interstate Commerce Commission for a rehearing does not operate to stay the execution of the Commission's order, unless the Commission, by special order, grants a stay, carriers objecting to an order for division of joint rates are entitled to regard it as final, for the purpose of bringing suit to enjoin its enforcement, without first making application for a rehearing.

Kennedy, District Judge, dissenting.

In Equity. Suit by the Abilene & Southern Railway Company and others against the United States of America and others, to enjoin the enforcement of an order of the Interstate Commerce Commission. Motions to dismiss the bill of complaint overruled, and permanent injunction granted.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

T. J. Norton, of Chicago, Ill., and M. G. Roberts, of St. Louis, Mo., for plaintiffs.

Blackburn Esterline, of Chicago, Ill., for the United States.

J. Carter Fort, of Washington, D. C., for the Interstate Commerce Commission.

Clifford Histed, of Kansas City, Mo., and E. A. Boyd, of Wichita, Kan., for Kansas City, M. & O. R. Co.

Before LEWIS, Circuit Judge, and KENNEDY, and SYMES, District Judges.

LEWIS, Circuit Judge. This is a final hearing on petition and application of 13 plaintiff carriers for the writ of injunction permanently restraining the enforcement of an order of the Interstate Commerce Commission made in August, 1922, in these terms:

"A hearing and investigation of the matters involved in this proceeding having been had, and said division having, on the date hereof, made and filed a report containing its findings of fact and conclusions thereon, which report is hereby referred to and made a part hereof:

It is ordered, That on and after September 15, 1922, the divisions of interstate joint rates received by Abilene & Southern Railway Company, the Atchison, Topeka & Santa Fé Railway Company, the Chicago, Rock Island & Pacific Railway Company, the Clinton & Oklahoma Western Railway Company, Fort Worth & Denver City Railway Company, the Galveston, Harrisburg & San Antonio Railway Company, Gulf, Colorado & Santa Fé Railway Company, Midland Valley Railroad Company, Missouri, Kansas & Texas Railway Company of Texas, and C. E. Schaff, Receiver, Missouri Pacific Railroad Company, St. Louis-San Francisco Railway Company, the Texas & Pacific Railway Company, and J. L. Lancaster and Charles L. Wallace, Receivers, and the Wichita Falls & Northwestern Railway Company, hereinafter termed the connecting lines, on freight traffic interchanged with the Kansas City, Mexico & Orient Railroad Company and its Receiver, and the Kansas City, Mexico & Orient Railway Company of Texas, and their successors, hereinafter termed the Orient, shall not exceed the following percentages of the divisions accruing on such traffic to said connecting lines, respectively:

Abilene & Southern Railway Company......................85 per cent.
The Atchison, Topeka & Santa Fé Railway Company........75 per cent.
The Chicago, Rock Island & Pacific Railway Company ......80 per cent.
The Clinton & Oklahoma Western Railway Company........90 per cent.
Fort Worth & Denver City Railway Company...............70 per cent.
The Galveston, Harrisburg & San Antonio Railway Company 75 per cent.
Gulf, Colorado & Santa Fé Railway Company..............70 per cent.
Midland Valley Railroad Company.........................80 per cent.
Missouri, Kansas & Texas Railway Company of Texas, and C.
  E. Schaff, Receiver.......................................80 per cent.
Missouri Pacific Railroad Company.......................80 per cent.
St. Louis-San Francisco Railway Company.................80 per cent.
The Texas & Pacific Railway Company, and J. L. Lancaster
  and Charles L. Wallace, Receivers......................80 per cent.
The Wichita Falls & Northwestern Railway Company........75 per cent.

"It is further ordered, That divisions of joint rates applicable to traffic as to which the Orient is an intermediate carrier shall be adjusted by the connecting lines on relative basis of proportions prescribed above.

"It is further ordered, That the several amounts by which the divisions accruing to said connecting lines are reduced under this order shall on and after September 15, 1922, accrue to the said Orient, in addition to the divisions theretofore accruing to said Orient on such traffic.

"It is further ordered, That the resulting divisions shall be reduced as far

as practicable to two-figure percentages according to the rule prescribed in said report.

"It is further ordered, That said connecting lines above named, according as they participate in the transportation, be, and they are hereby, notified and required to cease and desist, on and after September 15, 1922, and thereafter to abstain, from asking, demanding, collecting, or receiving divisions of said interstate joint rates with the Orient upon other basis than those above prescribed.

"It is further ordered, That said connecting lines, respectively, and the Orient shall jointly report to this Commission on or before September 15, 1922, the divisions established under this order, of each of said carriers with respect to freight traffic moving under interstate joint rates between each of the stations or groups of stations for which such divisions are determined; and shall thereafter jointly report the number of tons, ton-miles, and revenue with respect to such traffic actually interchanged for the period from September 15 to December 31, 1922, inclusive, and for the period from January 1 to June 30, 1923, inclusive; said reports for the period from September 15 to December 31, 1922, inclusive, shall be rendered on or before April 1, 1923, and the reports for the period from January 1 to June 30, 1923, inclusive, shall be rendered on or before October 1, 1923.

"It is further ordered, That the word 'division' as herein used, shall mean the total apportionment of a joint rate, whether determined by percentages, arbitraries, or otherwise.

"And it is further ordered, That this order shall continue in force until the further order of the Commission."

The proceeding resulting in the order against the 13 carriers complaining here was on application of the Kansas City, Mexico & Orient Railway Company of Texas and the Receiver of the Kansas City, Mexico & Orient Railroad Company, together called the Orient System, which owns and operates a continuous line of railroad 737 miles long extending from Wichita, Kansas, to Alpine, Texas. That application asked for relief from the Commission as to routing of traffic over the Orient System consigned by or to the United States, and also traffic not routed by the shipper (with neither of which we are now concerned), and also, thirdly, "for investigation and appropriate order applicable to just, reasonable and equitable division of joint and through rates, fares and charges to enable applicant to pay operating expenses and taxes on its railway property held for and used in the service of transportation, under Paragraph 6, Section 15, Interstate Commerce Act," as amended by the Act of February 28, 1920 (41 Stat. 474). The application recited that the Orient could not longer render transportation service to the territory which it served, pay the interest and principal on its loan from the United States and pay operating expenses and taxes on its property, unless it was given relief, and that it must cease operation if relief was not obtainable. It suggested for consideration as a method of relief an equalization of earnings between the weaker and stronger lines, and submitted with its application illustrated tables, Exhibits A to J, inclusive, of selected shipments that had been routed over its line. The first table selected a car of sewing machines shipped from Cleveland, Ohio, to San Francisco, which passed over six different lines including the Orient. The amounts received by each carrier under the existing divisions of the tariff were noted. The method suggested was to deduct from the earnings of the stronger lines a per cent. of their gross earnings per mile and apply it to the existing divisions of the weaker lines, thus changing the amount that would be received by.

each carrier, so that the initial carrier, the New York Central Lines, instead of receiving $141.73 would receive $88.52, and the Orient, an intermediate carrier, instead of receiving $159.73 would receive $226.96. All of the other exhibits dealt with through shipments and were illustrated in the same way, and it was said in the application:

"Under such a plan the gross earnings per mile of each line in the United States would be adjusted annually. The burden of supporting the weaker lines would automatically shift to the lines at the time most able to bear it. The transportation systems would become self-sustaining and the rate burden upon the public lessened. * * * Basing the distribution of earnings upon existing divisions, a plan should be adopted, which would prevent the stronger lines from retaining the earnings in excess of a 6 per cent. return, and whereby such excess could be automatically applied to the aid of the weaker lines participating in the haul. The problem of the weaker lines would then be solved. * * * We look to the Commission with a full assurance that the difficulties of the Orient System, and of all other weak lines, which are necessary to the communities served, will be met and that a plan will be adopted which will constitute a permanent cure, and not simply a temporary relief;"

and it was prayed that the Commission make investigation and appropriate orders in aid of the Orient System "applicable to divisions of rates, fares and charges in support of the weaker lines." Attention was called to the points or stations along the route of the Orient at which the roads of the 13 plaintiffs connected with the Orient.

An elaborate brief and argument accompanied the application, in which, in support of the third suggested method, it was said:

"The plan, here suggested, will enable the Commission, which has the power, to order the distribution of that fund, as soon as collected from the paying public, to the immediate relief of the lines requiring aid, and in such a form as will not exhaust the credit nor add to the ultimate burden of the line receiving the aid. If the weaker line can only have access to this fund as a borrower, the evil day is only postponed. The interest and the principal must be repaid eventually out of earnings. Before this weaker line can borrow, it must show that its line is a public necessity and that the money sought is necessary to enable it to perform its duty to the public; but it must repay out of money collected from the public the money so borrowed, with interest, in order to perform its duty to the public to whom it is a necessity. This is not arguing in a circle. It is simply stating the vicious circle into which the weaker line is drawn by the borrowing process under the law The Commission alone is clothed with power to extricate the weaker lines from this vortex. That the public money may perform its immediate public function in creating adequate transportation facilities is the design of the plan which we are asking the Commission to consider and adopt.

"It is inevitable that if the stronger lines are to be allowed to collect in the first instance earnings which will exceed the lawful return, there will accumulate in the hands of the Commission a large sum, which will only be available to the weaker lines for loan purposes. The conditions upon which these loans can be lawfully made are such that the loan itself will constitute only temporary relief, and will ultimately be a burden upon the weaker lines, and will defeat the purpose of the law as to service to the public. We respectfully submit that it would be more equitable and just to all concerned and to the public to establish a method which would render the necessary assistance to the weaker lines in the first instance, without carrying with it the burdens of a loan. It would be eminently fair and just that the surplus earnings of the stronger lines be automatically diverted to the weaker lines to such an extent as to enable the payment of operating expenses and taxes, without the necessity of the fund passing to the Commission and then to be distributed under loans. * * * There can be no question as to the authority of the Com-

mission to render essential aid by appropriate orders as to divisions of rates, fares and charges. It is this authority the exercise of which we are asking. With our request we are offering a workable plan which will accomplish the desired results. * * * The manifest purpose of the Congress, in the public interest, was to secure more liberal consideration for the weak roads than could be obtained by their unaided efforts. * * * We, therefore, urge the use of the present carrier divisions as the foundation upon which the Commission will construct a plan which will meet the equities and necessities of the case. This superstructure could be changed from time to time, as found necessary, without destroying or disturbing the fundamental basis. * * *

"In financing the operations of the weaker lines, the Commission has two available methods:

"First. It may distribute the earnings in excess of the legal return to the weaker lines in the form of a loan;

"Second. It may require a division of rates, fares and charges, under the plan which we prepare, which will automatically divert this surplus to the weaker lines."

So far it is clear that there was no suggestion of only a redivision of joint rates then existing between the Orient and the 13 plaintiff carriers whose roads physically connected with the Orient System, neither was there a claim that those divisions, or any of them, were "unjust, unreasonable, inequitable or unduly preferential or prejudicial" as between the carriers parties thereto. The application, the illustrative tables attached to it, and the brief and argument in support proposed no such method of assistance but a different one. The proposal was a redivision with all participating carriers on a plan which would require the stronger and more prosperous roads to sustain those that were weak and in failing financial condition, without regard to the amount or cost of services respectively rendered. It was said in the brief that the plan was preferable to the one adopted by Congress (section 15a) for loans to weaker roads and that its result, if enforced, would eliminate all necessity, indeed possibility, for making such loans. The Orient's application was received by the Commission in February, 1922, and on the third of April following it entered an order making 39 railroad companies, including the 13 plaintiff companies, respondents, assigned the proceeding for hearing before Examiner Burnside on May 15, 1922, and directed that all respondents be cited to appear. The Commission by its order of that date instituted an investigation to determine whether or not the divisions of joint rates, fares and charges on interchange traffic were unjust, unreasonable, inequitable or unduly preferential or prejudicial within the meaning of the Interstate Commerce Act (Comp. St. § 8563 et seq.), and if so, the just, reasonable and equitable divisions thereof that should be received by the several carriers. It ordered that the applicants and each respondent should file with the Commission on or before the date of hearing a statement showing the number of tons and ton-miles of freight transported on their respective lines moving under joint rates and interchanged, and the revenues respectively received therefor, for the year ended December 31, 1921. The order recites that it was made upon consideration of the Orient's application. It did not make any railway company whose lines are wholly east of the Mississippi River a respondent, though the lines of some of the 39 respondents extended into territory east of the River.

When the taking of testimony came on before Examiner Burnside he asked counsel for the Orient to present its evidence. Three witnesses were called, the Orient's general traffic manager, its chief clerk to the traffic department, and its chief clerk to the general auditor. Their testimony and exhibits introduced clearly show that the Orient System cannot continue in operation unless it obtains assistance. Its property represents an invested capital of $29,000,000. The greater part of its line traverses a territory sparsely settled and semi-arid. For the greater part of the way it is in competition with other lines upon either side, not many miles distant. Its local traffic is necessarily light. Its outgoing tonnage is chiefly livestock, considerable cotton, some grain and a small amount in miscellaneous productions. Its revenues are not enough to take care of its operating expenses and taxes on the present tariff bases. Hence, there has been for several years a continuing deficit, averaging at the time of the taking of proof about $75,-000 a month. It has defaulted in the payment of interest on a loan obtained from the United States, extended to it through the Commission, of $2,500,000. Its failing condition as a self-sustaining carrier is conceded. The plan of relief which it proposed, and shown in its illustrated tables, was gone into extensively by its general traffic manager. He recommended it as an appropriate remedy in taking care of all weak lines. Its deficit for 1922 will exceed $1,500,000. To make this up on interchange traffic its share in joint rates would require an increase of more than 60 per cent. Owing to competition it was said to be impracticable to increase local rates. If the line remains with its termini at Wichita, Kansas, and Alpine, Texas,—not continued through to Kansas City from Wichita and from Alpine through the Republic of Mexico to the Pacific Coast, as originally projected,—it was the opinion of the general traffic manager that it would be impossible to make it pay operating expenses. Practically all of the testimony in the record was directed to show that the Orient System cannot be made self-sustaining under present rates and conditions. It was seeking relief, and it suggested a plan which it believed would relieve its necessities. It made the record. The plaintiffs, aside from furnishing the statements showing the number of tons and ton-miles of freight transported on their lines and interchanged with the Orient for 1921 and the revenues therefor accruing to the Orient and to the respective plaintiffs, introduced no evidence. At the close of the proof introduced by the Orient the matter was submitted on the record without argument. And thereafter on August 9, 1922, Division 4 of the Commission announced in writing its conclusions and entered the order set out above. It released all respondent carriers except the 13 named in its order, whose roads physically connect with that of the Orient System. It found that—

"the divisions of interstate joint freight rates on traffic interchanged between the Orient and its immediate connections are unjust, unreasonable, and inequitable, and that for the future in respect of traffic originating or terminating on the Orient just, reasonable, and equitable divisions of such joint rates accruing to each of the connecting lines should, on the average, not exceed the following percentages of such divisions:

Abilene & Southern ..........................................85 per cent.
Atchison, Topeka & Santa Fé ...............................75 per cent.
Chicago, Rock Island & Pacific ............................80 per cent.
Clinton & Oklahoma Western.................................90 per cent.
Fort Worth & Denver City..................................70 per cent.
Galveston, Harrisburg & San Antonio.......................75 per cent.
Gulf, Colorado & Santa Fé ................................70 per cent.
Midland Valley ...........................................80 per cent.
Missouri, Kansas & Texas of Texas.........................80 per cent.
Missouri Pacific .........................................80 per cent.
St. Louis-San Francisco ..................................80 per cent.
Texas & Pacific ..........................................80 per cent.
Wichita Falls & Northwestern .............................75 per cent.

"There are prescribed herein as the just, reasonable, and equitable divisions to be observed on and after September 15, 1922, divisions constructed substantially according to the following rules:

"Considering separately the several divisions of interstate rates on freight interchanged between the Orient and its connections and having origin or destination on the Orient, there shall be deducted from the revenue or proportion accruing under divisions to said connections, whether determined upon arbitraries or percentages or in any other manner, the percentages hereinafter indicated of the totals of such revenue or proportions creditable to freight revenue, account No. 101, of such connections respectively; and the amounts so deducted from the revenues or proportions of its connections shall be added to the revenue or proportions of the Orient, to wit:

Abilene & Southern. ......................................15 per cent.
Atchison, Topeka & Santa Fé ..............................25 per cent.
Chicago, Rock Island & Pacific ...........................20 per cent.
Clinton & Oklahoma Western ...............................10 per cent.
Fort Worth & Denver City .................................30 per cent.
Galveston, Harrisburg & San Antonio ......................25 per cent.
Gulf, Colorado & Santa Fé ................................30 per cent.
Midland Valley ...........................................20 per cent.
Missouri, Kansas & Texas of Texas.........................20 per cent.
Missouri Pacific .........................................20 per cent.
St. Louis-San Francisco ..................................20 per cent.
Texas & Pacific ..........................................20 per cent.
Wichita Falls & Northwestern .............................25 per cent.

"Divisions of joint rates applicable to traffic as to which the Orient is an intermediate carrier will be adjusted by the immediate connections on relative basis of proportions prescribed above;"

and its order followed.

[1-3] There is no evidence in the record as to what the divisions of tariffs between the plaintiffs, or any of them, and the Orient were, unless those facts, necessary as a basis to support the Commission's order, can be gleaned from the exhibits. There is no evidence in the record as to the amount and cost of service rendered by plaintiffs in the handling of interchange traffic, or any other proof tending to show that their proportions of divisions therefor were "unjust, unreasonable, inequitable, or unduly preferential or prejudicial" as between plaintiffs and the Orient, nor that the divisions prescribed by the Commission in its order are "just, reasonable, and equitable" divisions as between them; unless those facts also can be adduced from some of the exhibits. Confessedly, from the arguments of counsel and their briefs, the issue comes down to the inquiry, whether or not the necessary facts in support of the Commission's order can be found in the exhibits; otherwise, there is no proof on which the order can be rested. The

necessities of a carrier, and the fact that it is being operated at a deficit, has been repeatedly held by the Commission to not be a sufficient ground on which to order an increase of divisions in favor of the failing carrier. The building of a line into non-supporting territory, or into a field already adequately served cannot be justly debited to other carriers, and as between the latter the fact that some have immediate connections seems wholly negligible as a ground of distinction. Federal V. R. R. Co. v. Toledo & Ohio Ry. Co., 68 I. C. C. 499; Laona & N R. Co. v. Minneapolis, St. P. & S. S. M. Ry. Co., 52 I. C. C. 7; McGowan-Foshee L. Co. v. Florida, A. & G. R. Co., 51 I. C. C. 317. Participating carriers in a joint service are entitled to be compensated in proportion to the amount of service and the cost of the service which they each render, and the fact that one of them is prosperous and the other not will not override the just right of each to a fairly proportionate share out of the joint earnings, whether the amount distributed to each be fully compensatory or be less to each than the value of the services so rendered. Pittsburgh & W. Va. Ry. Co. v. Pittsburgh & Lake Erie Co., 61 I. C. C. 272; New England Divisions Case, 66 I. C. C. 196. Paragraph 4 of Section 1 of the Act (Comp. St. § 8563) makes it the duty of participating carriers to establish and agree upon just, reasonable and equitable divisions between them of the joint rates, so that none of them will be unduly preferred or prejudiced. The law presumes that this duty and obligation which it imposes has been complied with, that the divisions which the participating carriers have made among themselves is just and equitable to each, and the Commission is without power under Section 15 (6) to prescribe new divisions unless after full hearing it be of the opinion on the facts adduced that the existing divisions are "unjust, unreasonable, inequitable or unduly preferential or prejudicial as between the carriers"; and unless in the record presented there be some evidence to sustain such a conclusion its order abolishing old divisions and establishing new ones is without support and non-enforceable. I C. C. v. L. & N. R. Co., 227 U. S. 88, 33 Sup. Ct. 185, 57 L. Ed. 431; I. C. C. v. U. P. R. Co., 222 U. S. 541, 32 Sup. Ct. 108, 56 L. Ed. 308; L. & N. R. Co. v. Finn, 235 U. S. 601, 35 Sup. Ct. 146, 59 L. Ed. 379; New York v. U. S., 257 U. S. 591, 600, 42 Sup. Ct. 239, 66 L. Ed. 385.

[4, 5] Taking up the exhibits (25 and 26, made up and offered by the Orient and corroborated by those which the Commission required the plaintiffs to file), they show as to interchange traffic with the Orient, including intra- with inter-state shipments, both as to that delivered to and received from the 13 connecting carriers, the tons and ton-miles as to each plaintiff, the amount of revenue to each, including the Orient, and the rate per ton-mile for the carriage. Comparing the rate per ton-mile received by the Orient with that received by all of the 13 connecting carriers on all of their interchange business with the Orient for the year 1921, it appears that the rate to the Orient on that basis is slightly in excess of the average to all of the connecting carriers on the same basis, that is to say, the Orient received .0147 cents per ton-mile, while the average received by all of the 13 connecting carriers was .012 cents. It received a higher ton-mile rate, both

on traffic which it originated and also on traffic delivered to it by plaintiffs, than they received. Its ton-miles were less than the ton-miles of all of the plaintiffs in 1921 on the interchange traffic, and yet it received for its service $635,000 more than the total received by plaintiffs. The rate per ton-mile is not regarded as determinative of the amount and cost of service, but we think the record shows no better guide on that inquiry. We appreciate the fact that the ability of the Commission to make proper deductions and conclusions from statistics embodied in these exhibits, with which it is their duty to constantly deal, is far greater than ours; but after prolonged study of these exhibits we have been unable to find in them any proof which in our judgment tends to show what the existing divisions were, or to support a conclusion that those divisions are unjust, unreasonable, inequitable or unduly preferential or prejudicial as between the participating carriers. We are confirmed in our conclusion in that respect, because counsel for the Commission does not argue that the exhibits alone show the divisions or that they are unjust and inequitable, but for that purpose contends that the exhibits coupled with data taken from the annual reports of the Orient and the 13 plaintiff carriers, which are set out in tabulated form in the Commission's report, sustain the conclusion of fact and order. He concedes that the data so made up from the annual reports as in part the basis for the Commission's conclusion could not be obtained from the testimony and exhibits in the case, but contends that the Commission had a right to consider the annual reports filed with it by the carriers, for the purposes for which they were used in reaching its conclusion. The annual reports were not offered in evidence, and counsel for plaintiffs insist that for that reason the Commission had no right to consider them. The proposition as to whether the annual reports could be considered arose early in the taking of the testimony. The Examiner said:

"I have no doubt it will be necessary to refer to the annual reports of all these carriers. Will it be understood at the outset that those reports may be referred to?"

Counsel for plaintiffs replied:

"If anything from the annual reports is to be considered in the case it should be formally a part of the record by abstract or extraction therefrom."

Thereupon the Examiner said:

"The rules of practice of the Commission now effective, I think, provide that the annual reports may be used in evidence, and the requirement is that all matters which may be pertinent or which may be used in the case, be reproduced and furnished in exhibits, but that would be quite a burden, and I feel constrained to proceed under the rule of the Commission."

The rule of the Commission which the Examiner and counsel must have had in mind reads thus:

"(a) Where relevant and material matter offered in evidence by any party is embraced in a book, paper, or document containing other matter, not material or relevant, the party must plainly designate the matter so offered. If the other matter is in such volume as would unnecessarily cumber the record, such book, paper, or document will not be received in evidence but may be marked for identification and, if properly authenticated, the relevant and

material matter may be read into the record, or, if the presiding Commissioner or examiner so directs, a true copy of such matter, in proper form, shall be received as an exhibit, and like copies delivered by the party offering the same to opposing parties or their attorneys appearing at the hearing, who shall be afforded opportunity to examine the book, paper, or document, and to offer in evidence in like manner other portions thereof if found to be material and relevant.

"(b) In case any portion of a tariff, report, circular, or other document on file with the Commission is offered in evidence, the party offering the same must give specific reference to the items or pages and lines thereof to be considered. The Commission will take notice of items in tariffs and annual or other periodical reports of carriers properly on file with it or in annual, statistical, and other official reports of the Commission. When it is desired to direct the Commission's attention to such tariffs or reports upon hearing or in briefs or argument it must be done with the precision specified in the second preceding sentence. In case any testimony in proceedings other than the one on hearing is offered in evidence, a copy of such testimony must be presented as an exhibit. When exhibits of a documentary character are to be offered in evidence, copies must be furnished to opposing counsel;"

and we are of opinion that the statement of the Examiner was notice to the parties that the annual reports would not be considered unless the rule was complied with, and it was not complied with. It follows that the annual reports and the data which they contain were not made a part of the record, and were not properly before the Commission for consideration in reaching its conclusion.

[6] But taking the data extracted by the Commission from the annual reports and embodied in its opinion, their utilization was comparative,—not self-probative of the ultimate fact, but supposedly a means to ascertain that fact. They showed all business done by all participating carriers in 1921 as to revenues and expenses per equated ton-mile, car-mile and train-mile in cents, the net revenues and the net railway operating income in the same units, the gross and net revenue return in dollars per $1,000 invested, and the railway operating income, from which the per centums in gross and net revenues and railway operating income of each carrier is calculated and put down, from which it appears that the Orient sustained a deficit in railway operating income of 2.77 per cent., and the 13 plaintiff carriers a percentum profit as follows:

Fort Worth & Denver City Ry. ....................................... 12.13
Gulf, Colorado & Santa Fé Ry. ...................................... 10.73
Wichita Falls and Northwestern ...................................... 6.31
Atchison, Topeka & Santa Fé. ........................................ 6.27
St. Louis-San Francisco ............................................. 4.77
Wichita Valley ...................................................... 4.66
Chicago, Rock Island & Pacific ...................................... 4.24
Abilene & Southern .................................................. 4.09
Missouri, Kansas & Texas of Texas ................................... 3.42
Missouri Pacific .................................................... 2.71
Texas & Pacific ..................................................... 2.26
Galveston, Harrisburg & San Antonio ................................. 1.88
Clinton, Oklahoma & Western ......................................... 1.39

[7] On the ton-mile unit the revenues of nine of the plaintiffs were less than that of the Orient, on the car-mile unit two of the plaintiffs received less revenue than the Orient, and on the train-mile unit the revenues of the Orient were substantially less than any of the plain-

tiffs; on the same units the operating expenses per equated ton-mile of two of the plaintiffs were greater, on the car-mile 4 were greater, and on the train-mile 6 were greater than the Orient. The Orient sustained a net loss under all three units of measure applied, while all of the 13 plaintiffs show a profit under each measure. The annual reports from which the Commission obtained and used its data as proof covered all of the business of the 13 plaintiffs, both freight and passenger, the lines of some of them extending through many States,—one from Chicago to California, and others serving territory equal in extent, and we are unable to understand how the deductions made by the Commission from the annual reports may be considered to any extent as a helpful guide in determining whether the divisions of freight rates on traffic interchanged with the Orient were unfair or inequitable, or as contributive facts in determining just and equitable divisions between them. We think they added nothing to the facts in the record for the solution of the issue before the Commission under Section 15 (6) of the Act. It seems to us that the inquiry was not directed to an ascertainment of the relative amount and cost of service on interchange traffic as between the Orient and the plaintiffs, and that there is no proof, including the annual reports, which will sustain a conclusion that existing divisions were unjust and inequitable at the time the order was made. The order is said to be of the blanket type. It cut through all existing divisions alike and took from each carrier a uniform per cent. and added it to the Orient's share under the old divisions. A comparison of those per cents with the percentums of railway operating income discloses that the greater the income of plaintiffs the greater the increase allowed the Orient by deductions from the more prosperous roads. This was the method of relief proposed by the Orient in its application.

The Transportation Act discloses no intention to vest the Commission with power to relieve the necessities of weaker lines by imposing the burden upon its connections, simply because they are able to bear it. It exhibits a contrary purpose in Section 422 adding Section 15a to the Interstate Commerce Act, because that policy would tend to bring all carriers to the same level in earnings and there would be no necessity for loans and no fund probably could be recovered for making them.

[8] Much stress is placed on the literal expression found in Paragraph 6, Section 15, as to what the Commission shall consider "in so prescribing and determining the divisions of joint rates, fares and charges." Efficiency is an element in the cost of service, though not, we believe, to the extent of giving a reward to inefficiency; revenue required to pay operating expenses, taxes and a fair return is of weight in determining whether an increase in the joint rate should be allowed, and if so, whether all or what part of the increase should be given to a particular carrier, or whether there should be a decrease, and how borne; likewise, the importance to the public served, as to what the joint rate should be. But Paragraph 6 is not isolated. Other parts of Section 15 give the Commission power to fix joint rates. Its whole power over the subject is in contemplation in Paragraph 6. There is

288 F.—8

thus a mingling in that paragraph of subject-matters to be considered by the Commission on the different inquiries, some of weight in determining what the joint rates should be, in which both the public and all participating carriers are interested, and others in which the public has no concern. It is not interested as to which participant be the originating, intermediate or delivering carrier, nor the mileage haul of each, nor how existing divisions should be divided between them, except remotely. No one but participating carriers are interested in a redivision of existing rates. So that it seems obvious to us that the phrase in Paragraph 6 so much relied upon intends that all of the subjects named for consideration have application only where the inquiry goes to the extent of both fixing and dividing the joint rates; and that where it extends only to a division of existing rates, some of the things named for consideration by the Commission have no relevancy to or weight in determining what the new divisions shall be. In such an investigation we think the controlling inquiry must necessarily be directed to ascertaining the amount and cost of service to each of them. It is not shown that the Orient maintains switching and terminal facilities for joint use, or is otherwise specially burdened at points of exchange, or that it is put to unusual expense in the joint service. It does show it makes empty hauls; but that, we take it, is true of all roads, especially when there is heavy movement to market. It is said that none of the territory along its line produces coal and lumber, and that it must receive those commodities, which it is required to use, from its connections at a charge for their service; but so far as the proof discloses that may be true also of some or all of the plaintiffs. In short, we find no facts in the record which sustain the order, except the broad proposition, amply supported by proof, that the Orient is not self-sustaining and needs help; but we cannot assent that the Commission is empowered to compel prosperous roads, because they are prosperous, to contribute their services to the sustenance of weak roads, because they are weak. The character of the inquiry and the character of the order force us to the conclusion that that was what the Commission intended to do and did do.

Neither side claims that the New England Divisions case (66 I. C. C. 196; Id., [D. C.] 282 Fed. 306) is controlling or even helpful here. It was said by the court in 282 Fed. 313:

"The question before the Commission was the apportionment of the joint fund in proportion to the services rendered."

The divisions there under consideration had stood for thirty years, the relations of the carriers to the joint service and the advantages and burdens imposed on each had greatly changed, the grounds on which the New England roads asked relief were definitely set out, wherein the changed conditions to their relative disadvantage is made to appear, and the District Court said the evidence sustained the claim. On appeal of that case the Supreme Court said (43 Sup. Ct. 270, 67 L. Ed. ——, opinion filed Feb. 19):

"An order, regular on its face, may, of course, be set aside if made to accomplish a purpose not authorized. * * * It is not true, as argued, that the order compels the strong railroads to support the weak,"

and that the increase given to the New England lines on the new division was all paid out of the rate increase ordered in Ex parte 74, 58 I. C. C. 220, and in a foot-note:

"Papers on the Commission's files are not a part of the record in a case, unless they are introduced as evidence."

[9] Both respondents have filed motions to dismiss, and it is claimed that they should be sustained because this proceeding was prematurely brought. It is argued that inasmuch as Section 16a of the Act gave the plaintiffs the right to apply to the Commission for a rehearing, that remedy should have been exhausted before this suit could be instituted. The application for a rehearing does not operate to stay the execution of the Commission's order. The Act provides that it be not stayed on such an application unless the Commission by special order grants a stay. Nothing could have been done by plaintiffs pending application for rehearing that would have stayed the execution of the order as a matter of right. We think plaintiffs were entitled to take the order as final for the purpose of this proceeding. See Chicago Ry. Co. v. Illinois Commerce Co. (D. C.) 277 Fed. 970.

It is our opinion that the motions should be denied and that plaintiffs are entitled to an order and writ as prayed.

KENNEDY, District Judge (dissenting). It is with regret that I find myself unable to accede to the views of the majority in the disposition of this case, although I have joined with the other Judges in signing the order carrying into effect their decision so that there may be no question as to its validity. I have been accorded the privilege of expressing my views as to the manner in which the case should be disposed of and herein express in a general way the reasons for my conclusion.

This is a proceeding involving the application of thirteen plaintiff carriers for a permanent writ of injunction restraining the enforcement of an order of the Interstate Commerce Commission made August 9, 1922, providing for an increased division of joint rates to the Kansas City, Mexico & Orient Railroad as against the plaintiff carriers.

After analyzing the case of the plaintiffs in the light of the points of attack carried in the arguments and briefs of counsel, I am constrained to eliminate from consideration as not having sufficient weight or bearing upon the controversy to entitle plaintiffs to relief, the following:

(a) It seems to me that there could be no question of confiscation generally where the Commission has made a division of joint rates. Such a division would not prohibit the carriers affected in establishing a new joint rate which would bring to them a greater amount of money for the service tendered. If the Commission should refuse to recognize such increased rate it might form the basis of an action in the courts that the established joint rate was confiscatory. In other words, until relief is denied by the Commission itself, which is not the situation in this case, the question of a rate being confiscatory could not be raised.

(b) I am not in accord with the views of the plaintiffs that the order of the Commission is invalid because of failure to join other carriers who participated in the joint rates affected by the order, for the rea-

son that the connecting carriers will simply be required to distribute the burden cast upon them among other connecting carriers, and so on among all carriers between or among which there is a joint rate established embracing the Orient Railway. It is the same as though these railroads had not yet but were now called upon to first establish joint rates as among all carriers.

(c) As to the questions decided by the Commission as reflected in the order attacked, not being within the issues raised by the pleadings before the Commission, I do not consider that the objection is well founded. As long as the Transportation Act gives the Commission the right to make investigations upon its own initiative as well as upon the complaint of one road as against another, coupled with the fact that in the first instance the Orient, with little attempt at formality of pleading or statement of ground for relief, simply ask the Commission to investigate the question of joint rates and the Commission thereupon proceeded to make such investigation, that we cannot well take the narrow view that the Commission did not have full power and authority upon the hearing to go into every phase of joint rates in which the Orient was interested.

(d) As to the point that the Commission arrived at its conclusions upon statistical data and information not introduced in evidence, I am inclined to believe that this is fully covered by the admitted procedure before the Commission that it is a quasijudicial body and not to be governed by the strict rules of evidence. The notice by the Commission to these carriers that it was investigating joint rates with the Orient was sufficient to bring to their attention that all matters incident to the changing of those rates was before the Commission. The chief criticism is that the Commission considered the annual reports of the carriers themselves in arriving at their conclusions. These reports are filed with the Commission, and so far as the carrier is concerned are authentic and binding upon it. The carrier was fully cognizant of the contents of the report and could not very well be heard to deny the truth of its contents. It is an admission against interest. In an investigation of this character instituted by the Commission upon the suggestion of a carrier concerned in joint rates, I consider it to be incumbent upon each carrier summoned to give the Commission a full, fair and frank statement and proof of how any diminution in joint rates then under consideration would affect it. This the plaintiffs in this case did not consider it to be their duty to do, as they offered no evidence. The very establishment of the Commission itself carries the conclusion that it was the idea of Congress to establish a flexible tribunal consisting of experts to pass upon those questions which manifestly could not be effectively handled by the courts. A kindred thought arises in this connection, that such tribunal must be allowed the greatest possible latitude within only constitutional limitations in working out the problems before it without interference from the courts.

As a matter of fact, the record discloses that the respondent carriers had notice that annual reports would be referred to and considered in the proceeding (Printed Record, p. 74). It was earnestly argued by counsel for plaintiffs that this could not be done without the formal

introduction of the reports in evidence or such portions of them as the parties before the Commission desired to have considered in their behalf. In one of the rules of the Commission, however, appears this paragraph:

"The Commission will take notice of items in tariffs and annual and other periodical reports of carriers properly filed with it. * * * "

It is true that the same rule provides how the parties before the Commission may direct the Commission's attention to such reports by specifying and identifying the particular portions desired to be considered. It would seem that a liberal construction of this rule might be that the Commission could under this rule, upon its own initiative, consider annual reports of the carriers filed with the Commission, whether formally introduced by the litigants or not. Certainly it has probative force in connection with the statement of the examiner, the official representative of the Commission, that these reports were going to be used, of which the carriers had notice early in the proceeding. This, in connection with the admitted competency of the reports as evidence would seem to me to be sufficient as to the form of introduction in a proceeding before the Commission, if not in strict accordance with court procedure.

(e) I do not agree with the contention of counsel for the plaintiffs that the matter before the Commission was disposed of solely upon the theory of taking from the stronger and giving to the weaker. However, a fair interpretation of section 15, subdivision 6, of the Transportation Act would seem to imply that the Commission may now take into consideration elements in determining the basis of joint rates which reflect in a degree the right of the Commission to have as one of its chief purposes the building up of an effective transportation system throughout the country. In fact the Supreme Court has held this affirmatively in the Wisconsin case in construing the act before the recent amendment. R. R. Commission of Wisconsin v. C., B. & Q. R. R. Co., 257 U. S. 585, 42 Sup. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086. Does it not therefore logically follow that where the carrier is operating under such conditions as to make its operation from the standpoint of a financial success extremely difficult, but that the carrier is necessary to the service of the country through which it runs, that in the broad light of giving effective service to the people it becomes necessary to adopt the very broadest policies in the treatment of such a carrier? As a concrete illustration, it is for the good of the people of Boston to be able to ship goods to a point in Texas on the Orient Railway and so from any other portion of the United States. In the long run such a policy would not work as a hardship against the similar participation of other roads in a joint rate but would generally, at least eventually, mean a greater amount of business for those roads. They could not, therefore, complain unless the Interstate Commerce Commission should order that they conduct their joint traffic with the Orient upon a basis which was confiscatory, but that question is not in this case as the Commission has not denied them relief growing out of the situation brought about by the lesser division to them of joint rates with the Orient.

As to a contribution by the stronger to the weaker, while not recognized as a basis for the determination of property rights, yet as a principle it does exist in every activity of life. The strong absorb the deficiencies of the weak. One customer of a merchant fails to pay his honest debt and that merchant as a result must charge a higher rate upon his products for sale so that his loss is absorbed in the general business and this burden falls upon those who do pay their debts. I am not seeking, however, to justify and sustain the order of the Commission upon the basis that the Commission has adopted in this case, the theory of taking from the stronger and giving to the weaker road, but in the general plan of carrying out the purposes of the transportation problem of the country as contained in the Transportation Act and as interpreted by the courts, it becomes necessary in a measure to distribute the burden so that the entire country will have the benefit, as far as may be possible, of efficient transportation facilities. As soon as it may be determined that a common carrier is a necessary servant for the community in which it exists, in which determination the Commission is the sole arbiter, it then becomes necessary for the Interstate Commerce Commission to see that it does exist, which could not be brought about by the infliction of prohibitive high local rates not to be reasonably borne by the peoples and industries which the carrier immediately serves.

The principal ground upon which we all agree that enforcement of the order complained of must be restrained, if at all, is, that there is a lack of sufficient substantial evidence in the record to sustain the order.

The main argument of counsel for plaintiffs upon this point is that without an introduction of division sheets showing what the divisions actually were, the Commission had no evidence to base its finding of fact as to the division of joint rates to the Orient being unjust, unreasonable or inequitable, and that in the absence of this or such a number of them for examples as would enable the Commission to determine with a degree of accuracy the general trend of divisions, that there was no evidence before the Commission upon this point. Counsel strongly rely upon the New England case in supporting this contention. It is true that the decision in the New England case by the Commission was based upon evidence afforded through division sheets. It does not follow that the evidence in this or any other case must necessarily be based upon division sheets if the evidence can be presented to the Commission in another form.

It is contended by counsel for the Commission that the evidence in this case while not in the form of division sheets, is much more complete and exhaustive than were division sheets relied upon, and I agree with counsel in this contention. Division sheets, unless tens of thousands were introduced in evidence, could only be used as samples in reflecting joint rates upon different commodities from which the Commission would be required to draw general conclusions as to the fairness of all joint rates. In the case at bar the proceeds from joint rates were themselves definitely and accurately determined. Printed Record Exhibits 25 and 26. By a process of computation the funds actually

accruing from joint rates to the Orient and to its connections were determined, which as a problem gives the actual definite answer with relation to which the consideration of sample division sheets would only be an approximate guess.

Therefore all the evidence which would have been before the Commission by the introduction of so-called sample division sheets, the Commission had before it in the form of evidence determining the actual results in dollars and cents based upon joint rates between the Orient and its connections. This in my opinion would give a more substantial basis upon which to predicate any action by the Commission than would division sheets, for the reason that the method reflects the concrete result of all divisions of the joint rates in controversy. These amounts received were analyzed in connection with the tonnage and the ton-miles which the joint fund divided between the several carriers represented and afforded a basis of determining the revenue per ton-mile of all carriers concerned. A further analysis probably demonstrated that the Orient was receiving more for its service on the basis of per ton-mile than the majority of its carriers, which might be taken superficially to prove that the present divisions in force before the order of the Commission went into effect were then just and equitable so far as the Orient was concerned. It is admitted, however, by both sides to this controversy that the per ton-mile basis is not a fair one for sole use in determining divisions. So many different elements enter into the determination of the cost of service that the per ton-mile should only be considered as one element  This was evidently the idea of the Commission because it proceeded to go further in its investigation as to the elements entering into the service required in carrying on joint traffic. Many pages of the record are used in ascertaining the physical facts surrounding the operation of the carriers. With the Orient it was found that it operated under many conditions which were not common to railroads. The fact that it runs through a comparatively sparsely settled portion of the country, affecting its local traffic, that it does not have fuel and building material upon or in proximity to its line and thereby being compelled to pay tonnage to other lines in order to secure these necessary supplies, and that in the shipment of live stock, cement, etc., in proximity to its lines, it must undergo a long haul of empty cars on account of there being only a one-way tonnage available, as well as other elements of difference in situation, compared with that of its connecting carriers. All of this data and material were gathered from the evidence itself introduced or from facts of which the Commission should take judicial notice and were evidence in the case upon which the Commission had the right to base a decision, that all elements considered, the Orient was not receiving its fair and just proportion of joint rates. And so far as this court is concerned it is only incumbent upon the Commission to secure its order against attack in this proceeding, to demonstrate to this court that there was substantial evidence to support the order.

As was said by the Supreme Court in the recent case of Akron, Canton & Youngstown Railway Co. et al. v. United States, 43 Sup. Ct. 270, 67 L. Ed. ——, decided February 19, 1923:

"To consider the weight of the evidence, or the wisdom of the order entered, is beyond our province."

Particular criticism is made of the tabulation found on page 404 of the report in that it purports to have been made up by the Commission from the annual reports of the railroads before the Commission in this hearing in that, first, the reports ought not to have been considered as evidence as heretofore suggested because not formally introduced in evidence; and, second, that it purports to have been made up from the revenues of the railroads in their entirety and not from revenues accruing from divisions of joint rates, or even from freight as distinguished from passenger traffic. I consider that the latter criticism is in a way justified, but computations from these reports need only to be used in a sense as being persuasive that the division of joint rates to the Orient are inequitable. It must be admitted, I believe, that it would be absolutely impossible to determine with absolute accuracy the separate and distinct cost of carrying on joint traffic as distinguished from all other traffic which the road carriers on, whether that traffic be freight or passenger, with a single train carrying both joint and other traffic, and otherwise subject to varying conditions. It would seem to me to be practically impossible to segregate the different classes of traffic and say with respect to joint traffic there were a profit or loss, or with respect to other traffic there were a profit or loss. It would be difficult for a merchant to say with a degree of accuracy that the carrying of a specific bolt of cloth upon his shelves caused him to suffer a direct profit or a direct loss. It might be that the possession for sale of that particular bolt of cloth in itself might not reflect a profit, and yet its possession for the satisfaction of a single customer might bring a large profit accruing from the sale of his other materials in stock.

The compilation therefore as referred to might not be conclusive, independent of all other evidence, as proving the unfairness of the joint rates to the Orient and yet itself an element which the Commission had the right to take into consideration; and in fact it may be the best available method of securing in its larger sense a reflection of the fairness of a division of joint rates among carriers. This compilation shows generally a greater net revenue, in relation to operating expense, to plaintiff carriers than to the Orient.

If our conclusion be sound that there is in the record substantial evidence to sustain the order of the Commission, it seems to me we do not arrive at the point of considering whether the percentage basis adopted by the Commission with respect to the different roads were proper or otherwise. If that percentage should be unfair in some instances the door of the Commission is open to those who consider themselves aggrieved thereby. It is not for this court, untrained in the technical proposition of rate-making, to presume to say that the divisions are too high or too low, especially until such time as hereinbefore intimated, that the Commission has established a rate which will work a confiscation of the property of the carrier. We can conceive that it might be found by the Commission, upon these carriers feeling themselves aggrieved by the order and presenting evidence sustaining their contention of unfairness, that the Commission might modify the

percentages to suit the facts then before them, or the Commission might upon application permit the joint carriers to profit by a raise in rate. This, however, is for the Commission to determine and not the courts.